Pro Se Plaintiff
Crystal L. Cox
**(406) 624-9510**
PO Box 2027
Port Townsend, WA 98368

FILED _____
LODGED _____
RECEIVED _____ | **MAIL**

MAY 14 2013

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
DEPUTY
BY
Received From
SEATTLE
MAY 16 2013

U.S. District Court
Western District of Washington
Seattle

Case Number Pending
Jury Demand

Crystal L. Cox, Plaintiff
1-5000 John and Jane Doe Plaintiffs

# C13-5364 BHS

v.

Defendants

SERVE:

NATIONAL ASSOCIATION OF REALTORS
430 North Michigan Ave.
Chicago, IL 60611,

MAR
Montana Association of Realtors
1 South Montana Avenue, Suite M-1
Helena, Montana 59601

NMAR
Northwest Montana Association of Realtors
110 Cooperative Way
Kalispell, MT 59901

Zipforms
zipLogix
18070 15 Mile Road
Fraser, MI 48026

Defendant(s) 1 - 1000
John and Jane Doe

# Cause of Action

**1.)  Anti-Trust Laws, Competition Laws, the Sherman Act, Clayton Act, Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act") Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, to obtain equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1.**

**2.)  Civil Conspiracy**

**3.) Tortious Interference with Business. Title 11 of United States Code, 11 U.S.C. §101-1330, All Laws applying to Tortious Interference.   Interference with Plaintiff's Prospective Business Advantage**

# Parties

Plaintiff Crystal L. Cox is a Resident of Washington State

Defendant NATIONAL ASSOCIATION OF REALTORS is a Chicago Corporation / Association / Business

Defendant Northwest Montana Association of Realtors is a Kalispell Montana Corporation, Montana Business,

Defendant Montana Association of Realtors is a Helena Montana Corporation, Montana Business

Defendant zipLogix is a Michigan Corporation

## JURISDICTION AND VENUE

This Complaint is filed under Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, to prevent and restrain violations by defendant of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1337(a), and 1345.

Venue is proper in this district under 28 U.S.C. § 1391(b) because Plaintiff maintains its principal place of business and residence in the Western Washington District.

**Plaintiff appears in this action "In Propria Persona" and asks that her points and authorities relied upon herein, and issues raised herein, must be addressed "on the merits" and not simply on her Pro Se Status.**

Oftentimes courts do not take Pro Se Litigants serious. I, Plaintiff Crystal Cox wish to be taken serious and to not have my allegation dismissed.

"Court errs if court dismisses pro se litigant **without instructions of how pleadings are deficient** and how to repair pleadings." Plaskey v CIA, 953 F .2nd 25. The Court granted such leniency, or "liberal construction," to pro se pleadings against the backdrop of Conley v. Gibson's undemanding "no set of facts" standard. ( See Conley v. Gibson, 355 U.S. 41, 45-46 (1957) ("[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."), abrogated by Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561-63 (2007). This standard epitomized the notice-pleading regime envisioned by the drafters of the Federal Rules, who emphasized discovery as the stage at which a claim's true merit would come to light, rather than pleading. See Christopher M. Fairman, The Myth of Notice Pleading, 45 ARIZ. L. REV. 987, 990 (2003) ("With merits determination as the goal, the Federal Rules create a new procedural system that massively deemphasizes the role of pleadings.").

The Court's failure to explain how pro se pleadings are to be liberally construed. ( See Bacharach & Entzeroth, supra note 7, at 29-30 (asserting that because the Supreme Court never defined the "degree of relaxation" afforded pro se pleadings in comparison to the liberal notice pleading standard applicable to all litigants, lower courts adopted different iterations of the rule). ~ .. indicates its belief that the standard was already lenient enough to render a detailed articulation of the practice unnecessary to

prevent premature dismissal of meritorious cases. However, with Bell Atlantic Corp. v. Twombly ( 550 U.S. 544 (2007). and Ashcroft v. Iqbal ( 129 S. Ct. 1937 (2009) retiring the "no set of facts" standard and ratifying the means by which lower courts dismissed more disfavored cases under Conley, ( See generally Richard L. Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, 86 COLUM. L. REV. 433, 435-37 (1986) (explaining how the reemergence of fact pleading resulted from lower courts' refusals to accept conclusory allegations as sufficient under the Federal Rules in particular categories of suits).

.. liberal construction as presently practiced is not—if it ever was—sufficient to protect pro se litigants' access to courts. The new plausibility standard ( See Twombly, 550 U.S. at 570 (requiring a complaint to allege "enough facts to state a claim to relief that is plausible on its face").. with which courts now determine the adequacy of complaints disproportionately harms pro se litigants. ( See Patricia W. Hatamyar, The Tao of Pleading: Do Twombly and Iqbal Matter Empirically?, 59 AM. U. L. REV. 553, 615 (2010) (observing a substantially greater increase in the rate of dismissal of pro se suits than represented suits post-Iqbal).

"Pro se complaint[s], 'however inartfully pleaded,' [are] held to 'less stringent standards than formal pleadings drafted by lawyers. ( Estelle v. Gamble, 429 U.S. 97, 106 (1976) (quoting Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (per curiam)).

HAINES v. KERNER, ET AL. 404 U.S. 519, 92 S. Ct. 594, 30 L. Ed. 2d 652. Whatever may be the limits on the scope of inquiry of courts into the internal administration of prisons, allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We cannot say with assurance that under the allegations of the pro se complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). See Dioguardi v. Durning, 139 F.2d 774 (CA2 1944).

ESTELLE, CORRECTIONS DIRECTOR, ET AL. v. GAMBLE 29 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251. We now consider whether respondent's complaint states a cognizable 1983 claim. The handwritten pro se document is to be liberally construed. As the Court unanimously held in Haines v. Kerner, 404 U.S. 519 (1972), a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id., at 520-521, quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)

BALDWIN COUNTY WELCOME CENTER v. BROWN 466 U.S. 147, 104 S. Ct. 1723, 80 L. Ed. 2d 196, 52 U.S.L.W. 3751. Rule 8(f) provides that " pleadings shall be so construed as to do substantial justice." We frequently have stated that pro se pleadings are to be given a liberal construction.

HUGHES v. ROWE ET AL. 449 U.S. 5, 101 S. Ct. 173, 66 L. Ed. 2d 163, 49 U.S.L.W. 3346. Petitioner's complaint, like most prisoner complaints filed in the Northern District of Illinois, was not prepared by counsel. It is settled law that the allegations of such a complaint, "however inartfully pleaded" are held "to less stringent standards than formal pleadings drafted by lawyers, see Haines v. Kerner, 404 U.S. 519, 520 (1972). See also Maclin v. Paulson, 627 F.2d 83, 86 (CA7 1980); French v. Heyne, 547 F.2d 994, 996 (CA7 1976). Such a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Haines, supra, at 520-521. And, of course, the allegations of the complaint are generally taken as true for purposes of a motion to dismiss. Cruz v. Beto, 405 U.S. 319, 322 (1972).

Both the right to proceed pro se and liberal pleading standards reflect the modern civil legal system's emphasis on protecting access to courts. ( See, e.g., Phillips v. Cnty. of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008) ("Few issues . . . are more significant than pleading standards, which are the key that opens access to courts."); Drew A. Swank, In Defense of Rules and Roles: The Need to Curb Extreme Forms of Pro Se Assistance and Accommodation in Litigation, 54 AM. U. L. REV. 1537, 1546 (2005) (noting that "[o]pen access to the courts for all citizens" is one of the principles upon which the right to prosecute one's own case is founded).

**Self-representation has firm roots in the notion that all individuals, no matter their status or wealth, are entitled to air grievances for which they may be entitled to relief.** ( See Swank, supra note 1, at 1546 (discussing the importance of self-representation to the fundamental precept of equality before the law).

Access, then, must not be contingent upon retaining counsel, lest the entitlement become a mere privilege denied to certain segments of society. Similarly, because pleading is the gateway by which litigants access federal courts, the drafters of the Federal Rules of Civil Procedure purposefully eschewed strict sufficiency standards. ( See Proceedings of the Institute on Federal Rules (1938) (statement of Edgar Tolman),  reprinted in RULES OF CIVIL PROCEDURE FOR THE DISTRICT COURTS OF THE UNITED STATES 301-13 (William W. Dawson ed., 1938).

In their place, the drafters instituted a regime in which a complaint quite easily entitled its author to discovery in order to prevent dismissal of cases before litigants have had an adequate opportunity to demonstrate their merit. ( See Mark Herrmann, James M. Beck & Stephen B. Burbank, Debate, Plausible Denial: Should Congress Overrule Twombly and Iqbal? 158 U. PA. L. REV. PENNUMBRA 141, 148 (2009), (Burbank, Rebuttal) (asserting that the drafters of the Federal Rules objected to a technical pleading regime because it would "too often cut[] off adjudication on the merits").

Recognizing that transsubstantive pleading standards do not sufficiently account for the capability differential between represented and unrepresented litigants, the Supreme Court fashioned a rule of special solicitude for pro se pleadings. ( See Robert Bacharach & Lyn Entzeroth, Judicial Advocacy in Pro Se Litigation: A Return to Neutrality, 42 IND. L.REV. 19, 22-26 (2009) (noting that courts created ways to ensure that meritorious pro se suits would not be dismissed simply because the litigants lacked legal knowledge and experience, one of which was liberal construction).

Far from just articulating a common systemic value, though, the right to prosecute one's own case without assistance of counsel in fact depends significantly upon liberal pleading standards. ( Cf. Charles E. Clark, The New Federal Rules of Civil Procedure: The Last Phase— Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A.B.A. J. 976, 976-77 (1937) (commenting that liberal pleading rules were necessary to mitigate information asymmetries between plaintiffs and defendants that often led to premature dismissal of suits).

Notably, in no suits are such information asymmetries more apparent than those in which pro se litigants sue represented adversaries. These types of suits comprise the vast majority in which pro se litigants appear. Cf. Jonathan D. Rosenbloom, Exploring Methods to Improve Management and Fairness in Pro Se Cases: A Study of the Pro Se Docket in the Southern District of New York, 30 FORDHAM URB. L.J. 305, 323 (showing that the majority of pro se cases involve unrepresented plaintiffs who sue governmental defendants).

Plaintiff appears in this action **"In Propria Persona"** and asks that her points and authorities relied upon herein, and issues raised herein, must be addressed **"on the merits"**, Sanders v United States, 373 US 1, at 16, 17 (1963); and addressed with "clarity and particularity", McCleskey v Zant, 111 S. Ct. 1454, at 1470-71 (1991); and afforded " a full and fair" evidentiary hearing, Townsend v Sain, 372 U.S.293, at p.1 (1962). See also Pickering v Pennsylvania Railroad Co., 151 F.2d 240 (3d Cir. 1945).



Pleadings of the Plaintiff SHALL NOT BE dismissed for lack of form or failure of process.

All the pleadings are as any reasonable man/woman would understand, and: "And be it further enacted. That no summons, writ, declaration, return, process, judgment, or other proceedings in civil cases in any of the courts or the United States, shall be abated, arrested, quashed or reversed, for any defect or want of form, but the said courts respectively shall proceed and give judgment according as the right of the cause and matter in law shall appear unto them, without regarding any imperfections, defects or want of form in such writ, declaration, or other pleading, returns process, judgment, or course of proceeding whatsoever, except those only in cases of demurrer, which the party demurring shall specially sit down and express together with his demurrer as the cause thereof.

And the said courts respectively shall and may, by virtue of this act, from time to time, amend all and every such imperfections, defects and wants of form, other than those only which the party demurring shall express as aforesaid, and **may at any, time, permit either of the parties to amend any defect in the process of pleadings upon such conditions as the said courts respectively shall in their discretion, and by their rules prescribe (a)"** *Judiciary Act of September 24, 1789*, Section 342, FIRST CONGRESS, Sess. 1, ch. 20, 1789.

# General Allegations

Upon knowledge and belief, Plaintiff, Real Estate Broker, Crystal L. Cox brings this civil action pursuant to Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, to obtain equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1. And a violation of tortious interference laws, and a civil conspiracy in which has irreparable harm to Plaintiff Crystal Cox.

Plaintiff Crystal L. Cox became a Montana Real Estate Broker in April of 2000. Plaintiff Crystal L. Cox joined the Association of Realtors at that time under a Kalispell Montana Real Estate Brokerage. In May of 2001 Plaintiff Crystal L. Cox opened an Independent Real Estate Office in the State of Montana, named Ten Lakes Realty. After 6 years Plaintiff Cox QUIT the Association of Realtors, due to the Association of Realtors not standing up for Real Estate Consumers, not standing behind Plaintiff Crystal L. Cox when Plaintiff Cox tried to get help regarding Realtors, Members that were hurting real estate consumers, fighting against buyers rebates, lying to consumers, committing fraud, boycotting real estate firms that offered less commission, bullied other member and were flat out anti-real estate consumer.



Over the last 6 years Plaintiff has tried to join the MLS database that she had helped created. The MLS controlled by Northwest Montana Association of Realtors. Plaintiff Cox was forbidden from joining this MLS database unless she became a member of the Association of Realtors. Which Broker Plaintiff Crystal Cox felt was and is and anti-consumer association and she refused. Therefore Defendants forbid Plaintiff from using the MLS database system.

Upon knowledge and belief, The absolute last straw for me, Plaintiff Crystal Cox was in December of 2006, and on into the 2007, when I myself was involved in a real estate transaction of which cause massive financial damage to me personally as well as to my then partner, and I contacted the Association of Realtors, especially, the (then) CEO Kathy Schulte in regard to MLS data that reported a sale fail that looked to have an undisclosed inspection, and MLS data that had disclosed a known defect in the subject property on prior MLS sheets. Plaintiff Cox asked Defendant NMAR for information regarding this, and  Defendant NMAR's CEO at that time, Kathy Schulte denied Plaintiff COX this information without an attorney demanding the data, and Defendant NMAR's CEO at that time, Kathy Schulte claimed that she would be contacting Century 21 Land Office Eureka Montana to let Broker Mike Workman know that Plaintiff Cox was asking for this information and filing legal action against Mike Workman and Century 21. Defendant NMAR's CEO at that time, Kathy Schulte favored C21 as a franchise over the rights of Independent Real Estate Brokerage Ten Lakes Realty and over the individual rights of Broker Crystal L. Cox.

Upon knowledge and belief, Plaintiff Crystal L. Cox it was / is a violation of the civil, constitutional and lawful rights of Plaintiff Cox for the Association of Realtors to interfere in the outcome of a massive legal case that financially damaged Plaintiff, therefore, Plaintiff Crystal Cox had taken the LAST blow of unethical, unlawful, unconstitutional behavior and Plaintiff Cox QUIT the Association of Realtors.

This, on top of years of reaching out to the Association of Realtors regarding brokers who ran boycotts, lied to consumers, committed fraud, lied on data sheets, falsified information and the Association of Realtors provided no support in helping to protect real estate consumers.

### Plaintiff Crystal L. Cox QUIT the Association of Realtors in 2007

Plaintiff Crystal L. Cox did not want to quit the MLS (Multiple Listing Service") service. Plaintiff Cox only wanted to quit the Association of Realtors, however Plaintiff Cox was denied access to the MLS database, because she no longer wanted to be a member of their "club", their "cartel", their monopoly

Plaintiff Crystal L. Cox alleges that the MLS Database is created by Real Estate Consumers, Mortgage Brokers, Lenders, Banks, Appraisers, Real Estate Agents, and is not OWNED by the Association of Realtors, nor should the Association of Realtors control the data.

Plaintiff Crystal L. Cox alleges that it is a violation of Anti-Trust Laws, the Clayton Act and the Sherman Act to DENY non-Association of Realtors members to have MLS access.

Plaintiff Crystal L. Cox alleges that the MLS is a publicly built database. Plaintiff Crystal L. Cox alleges that the Public should have access to data that was created by their financial power, their business, their lives and is NOT a database that would EXIST without the PUBLIC at large.

Plaintiff Crystal L. Cox alleges that NAR violates public rights, public trust and is anti-consumer, while at the same time data mining real estate listings created by the public at large. Datamining photos, writeups, area details, and more as content on their websites, blogs, and in their magazines where they use that public content for private profit in selling ads to and affiliating with mortgage companies, law firms, home warranty companies, moving companies, Books, Classes, Home related businesses and products, and more.

Brokers who refuse to join, are kept from competing fairly. Meanwhile the Association of Realtors use members content created by area information, photos, write ups on property as their FREE content in magazines and on websites to use to bring in consumers of all kinds and make more money for the Association of Realtors. The Association of Realtors wants to force all Brokers to be members so that they have automatic content for their media, and they can sell ads, affiliate with related business and make billions. Meanwhile the Association of Realtors uses a large portion of members money to lobby to stay in business and to force consumers to use a "Realtor" and on TV and online ads which directly lie to real estate consumers about the real estate market and about their getting more protection in their real estate transaction if they use an Association of Realtors member. Which is a flat out fraudulent lie to the public at large, with malice, with intend to harm the public.

If Brokers, such as Plaintiff Crystal L. Cox, attempt to expose the Association of Realtors, they simply smack them down. Meanwhile they deny independants access to the MLS data system in which they claim ownership over, even though the public at large created the system.

The actions of Defendant are all WITHOUT the best interest of the Real Estate Consumer.

Plaintiff Crystal L. Cox alleges that many of the above noted companies are owned by Cendant / Realogy, by the real estate cartel magnates that own the biggest real estate franchises in the world such as C21, Sothebys, ReMax, Coldwell Banker and of which CONTROL the National Association of Realtors.

Plaintiff Crystal L. Cox alleges that Defendant NAR economists deliberately misled real estate consumers about it being the "time to buy". Even though NAR could clearly see the real estate market crashing, and even spoke on the issue at local NAR meetings.

Plaintiff Crystal L. Cox alleges that Defendant zipLogix, owner of zipForms is acting in conspiracy with Defendant NAR, MAR, and NMAR in order to exclude and discriminate against

non - Association of Realtor member, and that this is a violation of anti-trust laws in which has caused Plaintiff Crystal Cox harm

Plaintiff Crystal L. Cox alleges there should not be a "Public" version and a "Private" version of MLS data sheets. The Public version should DISCLOSE all that the Real Estate Agent, REALTOR, knows. Having 2 distinctly different MLS data sheets leaves room for fraud.

Plaintiff Crystal L. Cox alleges that NAR member do violate Anti-Trust laws every day in the "field". They do force the industry standard of a certain "going rate" commission. If non NAR members or even members try and charge less commission, offer flat rates or hourly rates, NAR Members BULLY, harass, boycott and tortiously interfere with their business and most of the time either shut that real estate brokerage down or FORCE them to be a "member". Which violates the Clayton Act, Sherman Act, Anti-Trust Laws.

Plaintiff Crystal L. Cox alleges that Defendants have caused her harm and are liable for the damage to her by violations of Anti-Trust laws, civil conspiracy, and tortious interference with her business.

Plaintiff Crystal L. Cox lost her Montana Real Estate business in the way she was operating before she quit NAR. As NAR member boycotted her, NMAR Kalispell Montana refused her access to the MLS that she had helped to build, and member retaliate against her personally and professionally, to the point that Plaintiff Crystal Cox has had to find work outside of the State of Montana.

Plaintiff Crystal L. Cox alleges Defendants are involved in a Civil Conspiracy in which they FORCE independent Real Estate Brokerages such as Ten Lakes Realty, owned by Plaintiff Crystal L. Cox to join their "Association" in order to do business in their "neck of the woods". Once Brokers, such as Plaintiff Cox join

Plaintiff Crystal L. Cox alleges that the "Public" created the MLS through their own buying and selling, loan procurement, investments and that the PUBLIC should have access to that information. The MLS should not be ONLY for those who are NAR members and therefore make more ongoing profits for Defendant NAR and the their Affiliated companies.

Plaintiff Crystal L. Cox alleges NAR claims to be of a "higher standard", yet they are not protecting real estate consumers, lie about market conditions, lobby for laws that are anti-consumer and engage in daily violations of anti-trust, anti-real estate consumer behavior, actions and even policies.

Plaintiff Crystal L. Cox alleges the Association of Realtors should not have so much "clout" and power on local planning boards, in State and Federal laws, and the Association of Realtors is actually anti-consumer and Pro big corporations that they advertise on Realtor.com, in their

Realtor magazines and affiliations and partnerships that NAR has that actually HURTS real estate consumers across the board.

Plaintiff Crystal L. Cox alleges in the State of Montana, once you refuse to be a member of the "cartel", "monopoly" Association of Realtors, you are therefore forbidden to use State real estate forms provided by zipLogix, Zipforms.  Plaintiff Crystal L. Cox alleges that this makes doing business as a Real Estate Broker in Montana nearly impossible for Real Estate Brokers who freely choose to NOT be a member of Association of Realtors.

Plaintiff Crystal L. Cox alleges that this caused her irreparable, immeasurable damage, loss and suffering and the Plaintiff Cox is allowed all relief allowable by law.

There are approx. 1000 MLS's in the U.S., it is very important to the public at large, and to a free marketplace for no exclusion or monopolistic actions, policies of any ONE MLS. A single MLS would eliminate a lot of the unfair practice of local "Realtor" boards and stop the monopolistic cartel actions of each individual board.

The Department of Justice and the Federal Trade commission are about preventing tyrannical MLS rules that reduce competition. Plaintiff Crystal L. Cox alleges that Defendant NAR, Defendant NMAR, Defendant MAR's Policy restricts fair trade, engages in unfair practice of local "Realtor" boards, and that Defendants have acted in civil conspiracy and in violation of Anti-Trust laws and have thereby caused Plaintiff Crystal Cox, owner of an Independent Real Estate brokerage, irreparable, immeasurable damage. Plaintiff Crystal Cox alleges she is entitled to all available relief by law.

**Plaintiff, Independent Real Estate Broker Owner Crystal Cox wishes this court to enjoin the Attorney General, DOJ, and FTC into this very important public concern and this action against Defendants.**

Defendant NAR, Defendant NMAR, Defendant MAR (The Realtor Boards) have used their MLS as an unlawful vehicle to suppress and reduce competition from entering their market place. And therefore have caused Plaintiff Crystal Cox irreparable, immeasurable damage. Plaintiff Crystal Cox alleges she is entitled to all available relief by law.

Defendant NAR, Defendant NMAR, Defendant MAR anti-trust violations are NOT in the publics best interest and in no way do these policies have anything to do with protecting consumers or improving the Realtor image.  And has everything to do with maintaining and enlarging the broker's market share that are MEMBERS of The Realtor Boards.

The actions and policies of Defendant NAR, Defendant NMAR, and Defendant MAR makes it impossible for small brokers trying to compete against them, against established brokerages who are members of NAR. And these actions are a violation of anti-trust laws, anti-competition laws and the constitutional rights of brokers are who are not members of the "club".

NAR has a long history of endorsing or refusing to enforce discriminatory and anticompetitive rules against its own associations. Starting in 1950 in U.S. vs National Association of Realtors (NAR), it was sanctioned for engaging in price-fixing:

There have been hundreds of similar court filings against boards and MLS's everywhere.

Defendant NAR, Defendant NMAR, and Defendant MAR have discriminated against independent brokerage firms for far to long and this court should establish a clear message that Defendant NAR, Defendant NMAR, and Defendant MAR are NOT allowed to create a monopoly and wipe out competition.

Billions of tax dollars have been spent by the government including local, state, and federal courts to eradicate anticompetitive practices that are either expressly or tacitly endorsed by NAR. It is time to STOP Defendant NAR, Defendant NMAR, and Defendant MAR from eradicating competition and violating antitrust laws.

NAR is one of the largest non-profit associations in the world yet it spends millions of member, Realtors dues on defending itself and other MLS's from unlawful conduct it sanctions. Plaintiff Crystal Cox alleges that this anti-competitive behavior has caused her brokerage damage and therefore she is due all allowable relief by law.

Defendant NAR, Defendant NMAR, and Defendant MAR won't change their ways until a government agency compels them to do so.

Plaintiff Crystal Cox alleges that Defendant NAR, Defendant NMAR, and Defendant MAR have caused her harm, and harm to other brokerage doing business as she, and Plaintiff Cox alleges that this causes direct injury to the public, to real estate consumers.

See Puget Sound Multiple Listing Service FTC Complaint and Bellingham-Whatcom County Multiple Listing Bureau, Exhibit A, hereby fully incorporated into this complaint, AND the Matter of American Industrial Real Estate Association, Exhibit B.

Competition in the Real Estate Marketplace, Case History, See Exhibit C.

Competition in Real Estate is extremely important to Real Estate Consumers, the actions of Defendant NAR, Defendant NMAR, and Defendant MAR are directly damaging to real estate consumers and Plaintiff wishes this court to set an example and end this anti-competitive behavior.

If it wasn't mandatory that BROKERS buy a Realtor membership in order to buy a MLS subscription, WE would not buy a membership.

Defendant NAR, Defendant NMAR, and Defendant MAR FORCE Plaintiff Crystal Cox and Brokers like her to be members in order to keep their cartel in business. Plaintiff Crystal Cox ALLEGES this is a violation of the Sherman Act, Clayton Act, Anti-Trust Laws and that this has cause Plaintiff Cox damage, and Plaintiff Cox ALLEGES she is entitled to all allowable relief by law.

## Factual Allegations

Plaintiff Crystal L. Cox has attempted on and off for the last 6 years to join the MLS database system in the Kalispell Montana Association of Realtors Office, Defendant NMAR. Plaintiff Cox has been told every time that she MUST join the local, state and national Association of Realtors in order to have access to the MLS as a tool of her Montana Real Estate Brokerage.

Plaintiff Crystal L. Cox still practices real estate in the State of Montana and has, in the last year, moved to the State of Washington in order to grow her real estate business in a more consumer friendly real estate marketplace. However, Plaintiff Cox's primary license is in Montana and she has clients who seek to list with her in Montana, however feel they cannot compete if they are not in the MLS database system. Therefore, Plaintiff's directly interfere with Plaintiff Cox's business.

MLS Data is created by Buyers, Sellers, Lenders, Appraisers, and Real Estate Brokers. MLS Data should NOT be controlled by the Association of Realtors, PERIOD.

## Cause of Action 1.) Anti-Trust Laws, Competition Laws, the Sherman Act, Clayton Act, Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act")

Plaintiff Crystal Cox incorporates the allegations and information in all preceding paragraphs in their entirety.

Plaintiff Crystal Cox alleges that Defendant have violated antitrust laws and therefore have caused Plaintiff Crystal Cox harm.

Plaintiff, Independent Real Estate Broker Owner Crystal Cox wishes this court to enjoin the Attorney General, DOJ, and FTC into this very important public concern and this action against Defendants. And Plaintiff Cox may seek civil action for this complaint, should independent brokerages step up to join Plaintiff Cox in this action.

Upon knowledge and belief, Plaintiff, Real Estate Broker, Crystal L. Cox brings this civil action pursuant to Section 4 of the Sherman Act, as amended, 15 U.S.C. § 4, to obtain equitable and other relief to prevent and restrain violations of Section 1 of the Sherman Act, as amended, 15 U.S.C. § 1.

See UNITED STATES OF AMERICA, Department of Justice, Antitrust Division,  v. NATIONAL ASSOCIATION OF REALTORS.

Plaintiff Crystal L. Cox alleges that in regard to a national association of real estate brokers, Defendant NMAR (Northwest Montana Association of Realtors), Defendant NAR (National Association of Realtors, and Defendant MAR (Montana Association of Realtors) maintaining and / or enforcing a policy that restrains competition from brokers who choose to not be member of the Association of Realtors, she has suffered irreparable harm.

Upon knowledge and belief, Plaintiff Crystal L. Cox alleges that Defendant NMAR (Northwest Montana Association of Realtors), Defendant NAR (National Association of Realtors, and Defendant MAR (Montana Association of Realtors) have acted in civil conspiracy and in violation of the Sherman Act, the Clayton Act and have excluded Plaintiff Cox from using a database that Plaintiff Cox claims should be open to NON Association of Realtor members and that in denying this, Defendants encourage boycotts, and essentially run independent brokerages out of Montana by way of "Cartel" type behavior and creating a monopoly of services and thereby bring a fair and unbiased marketplace to a HALT.

Plaintiff Crystal L. Cox alleges that NMAR refuses to allow her to be a member of the MLS service and thereby is restricting her trade and has caused her irreparable harm of which she is entitled relief.

The brokers against whom the policy of Defendant NAR, Defendant NMAR, Defendant MAR discriminates have a right to relief for the damage caused to their businesses and lives, in connection with their delivery of brokerage services in a fair and healthy marketplace.

It is important to have a fair and competitive marketplace. Important for Independent Brokerage Firms and important to real estate consumer and the public at large.

Defendant NAR, Defendant NMAR, Defendant MAR's Policy restricts the manner in which brokers do business and essentially shuts down their business UNLESS they become members of the club, the "cartel", Association of Realtors. Plaintiff Crystal Cox alleges this to be a violation of Anti-Trust laws, a violation of which has caused her damage and she is entitled to all allowable relief by law.

Upon knowledge and belief, Defendant NAR, Defendant NMAR, Defendant MAR denies brokers using what they claim to be "their" MLS system, when in FACT it was created by the public, by loans and lender, appraisers, buyers, sellers and non-NAR members.

In doing so Defendant NAR, Defendant NMAR, Defendant MAR have created a monopoly that has caused Plaintiff harm, and Plaintiff claims all allowable relief by law.

Defendant NAR, Defendant NMAR, Defendant MAR's Policy govern the conduct of its members in all fifty states, including all Realtors and all of NAR's member boards. NAR's member boards control approximately eighty percent of the approximately 1,000 MLSs in the United States. Plaintiff Crystal Cox alleges that by not allowing Non Association of Realtors access to a Public Database system that Defendant NAR, Defendant NMAR, Defendant MAR have created an unfair market place, have stifled competition and ran independent real estate brokerages out of business. This policy has directly caused Plaintiff Crystal L. Cox harm. Plaintiff Cox is entitled to all allowable relief by law.

Defendant NAR, Defendant NMAR, Defendant MAR's activities, and the violations alleged in this Complaint, affect independent real estate brokerages as well as home buyers and sellers located throughout the United States. Defendant NAR, Defendant NMAR, Defendant MAR, through its members, is engaged in interstate commerce and is engaged in activity affecting interstate commerce. And has a high duty in this regard to obey the law, to NOT violate anti-trust and to create, maintain and support a healthy, fair trade marketplace. Plaintiff Cox alleges that Defendants have not done so and have thereby caused Plaintiff harm and hardship.

MLS's are joint ventures among competing brokers, in a fair and healthy market place, to share their clients' listings and to cooperate in other ways. MLS databases list virtually all homes for sale through a broker in the areas they serve. In a substantial majority of markets, a single MLS provides the only available comprehensive compilation of listings. The MLS allows brokers representing sellers to effectively market the sellers' properties to all other broker participants in the MLS and their buyer customers. Conversely, the MLS allows brokers to provide their buyer customers information about all listed properties in which the customers might have an interest.

Plaintiff Crystal Cox alleges it to be a violation of Anti-Trust Laws, the Clayton Act, and the Sherman act to FORBID, Prohibit competition by NOT allowing Real Estate Brokerages that are not members of the Association of Realtors to join their database, use State forms, or participate in the local and national healthy real estate marketplace.

NAR rules govern the conduct of MLS's and requires its member boards to adopt these rules. Therefore NAR is directly responsible for the actions of Defendant MAR and Defendant NMAR. These actions have caused Plaintiff harm, and therefore Plaintiff Crystal Cox is entitled to all allowable relief by law.

Upon knowledge and belief Plaintiff Crystal Cox alleges, Being a part of the MLS data system is essential in a competitive real estate brokerage services system. For Defendant NAR, Defendant NMAR, Defendant MAR to BLOCK independent real estate brokerages, discriminate against non-members is a violation of law and has caused Plaintiff irreparable damage.

By virtue of industry-wide participation and control over a critically important input, MLS joint ventures have market power in almost every relevant market. And it is a violation of antitrust laws to EXCLUDE independent brokerages from fairly competing in this market place.

Upon knowledge and belief, Plaintiff Crystal Cox alleges that "Realtor", the National Association of Realtors has ownership, those who make money from NAR in which also own the TOP franchises such as Cendant, Realogy .. which own Century 21, Coldwell Banker, ReMax, Sotheby's and more. And these same corporations, people, figureheads own moving companies, title companies, home warranty companies, lending companies and more affiliated business. Plaintiff Crystal Cox alleges that this ownership and affiliation is a direct harm to real estate consumers and is exclusive of independent brokerages who refuse to be members and thereby do not contribute customers and clients to their affiliated business or content to their magazines and online databases of listings which sell massive ad space..

Upon knowledge and belief, Plaintiff Crystal Cox alleges that state, local and federal Associations of "Realtors" violate antitrust laws every day, they do engage in price fixing, and they do act in a manner that is anti-consumer and pro "Association of Realtor"

Upon knowledge and belief, Plaintiff Crystal Cox wishes this court, in conjunction with the FTC, DOJ and Attorney General to break up the Association of Realtors cartel and to provide a consumer friendly marketplace within the real estate industry.

By virtue of industry-wide participation and control over a critically important input, MLS joint ventures have market power in almost every relevant market. And by Defendant's deny independent brokerages access to this MLS data base, they essentially corner this market power in violation of ant-trust laws and the rights of consumer and independent brokers such as Plaintiff Crystal L. Cox.

Upon knowledge and belief, Plaintiff Crystal Cox alleges that violating the rights of independent real estate brokerages in favor of conglomerates, franchises, Association of Realtor members is unlawful, unconstitutional and violates ALL ideals and antitrust laws, as well as competition laws, the Sherman Act and aspects of the Clayton Act.

Anti-Trust laws are designed to promote conduct which encourages competition, even severely so, but against conduct which unfairly tends to destroy competition itself. The focus of U.S. competition law, is on protection of competition rather than competitors.

Sherman Act, 21 Cong.Rec. 2456. It was in this sense of preventing restraints on commercial competition that Congress exercised "all the power it possessed." Atlantic Cleaners & Dyers v. United States, supra, 286 U. S. 435.
At Addyston Pipe and Steel Company v. United States, 85 F.2d 1, affirmed, 175 U. S. 175 U.S. 211;


At Standard Oil Co. of New Jersey v. United States 221 U. S. 1, 221 U. S. 54-58.

Defendants have engaged in anticompetitive conduct and have thereby violated The Sherman Act.

Defendants actions are anticompetitive in nature. Thus violate the Sherman Act.

The Sherman Act Section 1 States:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."[14]


The Sherman Act Section 2 States:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony [. . . ]"[15]


Defendants have engaged in intentional misconduct and conspiratorial conduct of the kind forbidden by Section 1 of the Sherman Act, or Section 3 of the Clayton Act.



U.S. anti-trust laws, competition law focus on the protection of competition rather than competitors such as Defendants.

### "U.S. v. National Association of Realtors Civil Action No. 05 C 5140, COMPETITIVE IMPACT STATEMENT";

"Plaintiff United States of America ("United States"), pursuant to Section 2(b) of the Antitrust Procedures and Penalties Act ("APPA" or "Tunney Act"), 15 U.S.C. § 16(b)-(h), files this Competitive Impact Statement relating to the proposed Final Judgment submitted for entry in this civil antitrust proceeding.

### NATURE AND PURPOSE OF THE PROCEEDINGS

Overview. The United States brought this lawsuit against Defendant National Association of Realtors® ("NAR") on September 8, 2005, to stop NAR from violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by its **suppression of competition** from real estate brokers who use the Internet to deliver real estate brokerage services. NAR's policies singled out these innovative brokers and denied them equal access to the for-sale listings that are the lifeblood of competition in real estate markets. The settlement will eliminate NAR's discriminatory policies and restore even-handed treatment for all brokers, including those who use the Internet in innovative ways."


Defendants Defendant NAR, Defendant NMAR, Defendant MAR have violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by defendants suppression of competition in the MLS by way of excluding non Association of Realtor members, discriminating against Independent Brokerages and enacting policy in which is a violation of antitrust laws.

Plaintiff Crystal Cox seeks to eliminate discriminatory actions, laws, and rights afforded to Defendants and to ensure a healthy, honest, vibrant market place with independent brokerages treated equally as a matter of law and constitutional rights and thereby creating a consumer friendly, competitive marketplace.

### The  "U.S. v. National Association of Realtors Civil Action No. 05 C 5140, COMPETITIVE IMPACT STATEMENT" goes on to say:

"NAR's Challenged Policies. On May 17, 2003, NAR adopted its "VOW Policy," which contained rules that obstructed brokers' abilities to use VOWs to serve their



customers, as described below in Section II. After an investigation, the United States prepared to file a complaint challenging this Policy.

On September 8, 2005, NAR repealed its VOW Policy and replaced it with its Internet Listings Display Policy ("ILD Policy"). NAR hoped that this change would forestall the United States' challenge to its policies. NAR's ILD Policy, however, continued to discriminate against VOW brokers. As part of its adoption of the ILD Policy, NAR also revised and reinterpreted its MLS membership rule, which would have excluded some brokers who used VOWs, as detailed below in Section II. (NAR's VOW and ILD Policies, including its membership rule revision and reinterpretation, are referred to collectively in this Competitive Impact Statement as NAR's "Challenged Policies.") As an association of competitors with market power, NAR's adoption of policies that suppress new and efficient competition to the detriment of consumers violates Section 1 of the Sherman Act, 15 U.S.C. § 1."

See, UNITED STATES OF AMERICA, Department of Justice, Antitrust Division,    v. NATIONAL ASSOCIATION OF REALTORS.


### The  "U.S. v. National Association of Realtors Civil Action No. 05 C 5140, COMPETITIVE IMPACT STATEMENT" goes on to say:

"The Amended Complaint alleges that NAR's adoption of the Challenged Policies constitutes a contract, combination, and conspiracy by and between NAR and its members which **unreasonably restrains competition** in brokerage service markets throughout the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1."

"In the Amended Complaint, the United States asks the Court to order NAR to stop violating the law. The United States did not seek monetary damages or fines; the law does not provide for these remedies in a case of this nature."  UNITED STATES OF AMERICA, Department of Justice, Antitrust Division, v. NATIONAL ASSOCIATION OF REALTORS.



## REMEDIES AVAILABLE TO POTENTIAL PRIVATE LITIGANTS

Section 4 of the Clayton Act, 15 U.S.C. § 15, provides that any person who has been injured as a result of conduct prohibited by the antitrust laws may bring suit in federal court to recover three times the damages the person has suffered, as well as costs and reasonable attorneys' fees. UNITED STATES OF AMERICA, Department of Justice, Antitrust Division, v. NATIONAL ASSOCIATION OF REALTORS.

**Plaintiff Cox wishes the Department of Justice to bring action against Defendants as well, in order to STOP the monopoly that Defendant NAR, Defendant NMAR, Defendant MAR have created in their marketplace.**

That no interstate commerce is involved is not a barrier to a suit to enjoin violations of § 3 of the Sherman Act involving purely local conduct in the District of Columbia, since Congress specifically made § 3 applicable to such conduct, and had power to do so under Art. I, § 8, Clause 17 of the Constitution. Atlantic Cleaners & Dyers v. United States, 286 U. S. 427. P. 339 U. S. 488. United States v. Real Estate Boards, 339 U.S. 485 (1950)

The business of a real estate broker is "trade" within the meaning of § 3 of the Sherman Act. Pp. 339 U. S. 489-492.

(a) The services of real estate brokers cannot be assimilated to those of employees, nor can the present case be compared to those involving the application of the antitrust laws to labor unions -- notwithstanding § 6 of the Clayton Act declaring that "the labor of a human being is not a commodity or article of commerce" and exempting labor unions and their members from the antitrust laws. Pp. 339 U. S. 489-490.

(b) The fact that the business of a real estate broker involves the sale of personal services, rather than commodities, does not take it out of the category of "trade" within the meaning of § 3 of the Sherman Act, which is aimed at the fixing of prices and other unreasonable restraints in the case of services, as well as goods.

(c) The activity of a real estate broker is commercial and carried on for profit, and the competitive standards which the Sherman Act sought to preserve in the field of trade and commerce are as relevant to the brokerage business as to other branches of commercial activity. P. 339 U. S. 492.

4. That appellees were acquitted in a criminal prosecution for conspiracy to violate § 3 of the Sherman Act is no bar to this civil suit to enjoin the same conspiracy, since the doctrine of res judicata is not applicable. Helvering v. Mitchell, 303 U. S. 391. Pp. 339 U. S. 492-494.

5. The finding of the District Court that the National Association of Real Estate Boards and its executive vice-president did not in fact conspire with the Washington Board to fix and prescribe the rates of commission to be charged by members of the latter is sustained, since it was not "clearly erroneous" within the meaning of Rule 52 of the Federal Rules of Civil Procedure. Pp. 339 U. S. 494-496. 84 F.Supp. 802 affirmed in part and reversed in part.

In a civil suit in a federal district court to enjoin a conspiracy to fix rates of commissions of real estate brokers in the District of Columbia in violation of § 3 of the Sherman Act, judgment was entered for defendants. 84 F.Supp. 802. On appeal to this Court, affirmed in part and reversed in part, p. 339 U. S. 496. Page 339 U. S. 487

United States v. Real Estate Boards, 339 U.S. 485 (1950)

Just as in United States v. Real Estate Boards, 339 U.S. 485 (1950), Defendant NAR, Defendant NMAR, Defendant MAR have acted in conspiracy to restrict real estate brokers who are not members of their cartel. Plaintiff Crystal Cox alleges that this has caused her irreparable damage and that Defendants are liable for these actions and Plaintiff Crystal Cox is entitled to all relief allowed by law.

## Civil Conspiracy

Plaintiff Crystal L. Cox re-allege and incorporate the preceding paragraphs in their entirety.

Upon knowledge and belief, Plaintiff alleges that Defendants have Violated Civil Conspiracy Laws. Defendants have contracted, combined, or conspired with NAR in the violations alleged in this Complaint and have performed acts and made statements in furtherance thereof.

Defendant NAR, Defendant NMAR, Defendant MAR adoption of Policy that discriminates against non members to the point of interring with their business, is a violation of Anti-Trust Laws. Defendants policy to not allow independent real estate firms equal access to MLS data and standard real estate forms is a violation of Anti-Trust laws, in civil conspiracy which has caused Plaintiff harm.

Policy, equivalent provisions, constitutes a contract, combination, or conspiracy by and between Defendant NAR, Defendant NMAR, Defendant MAR which unreasonably restrains competition in brokerage service markets and is in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

The aforesaid contract, combination, or conspiracy has had and will continue to have anticompetitive effects in the relevant markets by suppressing technological innovation and participation in a publically created database, reducing competition, restricting efficient cooperation among brokers, making express or tacit collusion more likely, raising barriers to entry, and directly interfering with the independent real estate brokerages business model and ability to compete in a fair and open marketplace.

## Tortious Interference with Business

**Title 11 of United States Code, 11 U.S.C. §101-1330, All Laws applying to Tortious Interference.  Interference with Plaintiff's Prospective Business Advantage**

Upon knowledge and belief, Plaintiff alleges that Defendants have Tortiously Interfered with the business prospects, contracts, online marketing and more business opportunity of Plaintiff Cox.

Plaintiff Crystal L. Cox re-allege and incorporate the preceding paragraphs in their entirety.

Defendant have Violated Tortious Interference Laws and have interfered tortiously with the business, future business, clients, customers, buyers of Plaintiff Crystal Cox's products and services.

Plaintiff Crystal L. Cox has suffered irreparable damages.

Plaintiff Crystal L. Cox Requests a judgment against Each Defendant for actual and punitive damages, and all other relief allowable under the law and federal court rules.

Defendant are guilty of Tortious Interference.

Upon knowledge and belief, Plaintiff Crystal Cox alleges that Defendant are guilty of Tortious Interference with the business advantage of Plaintiff Cox.

## Claim of Relief

WHEREFORE, Plaintiff Crystal Cox prays that final judgment be entered against defendant declaring, ordering, and adjudging:

Plaintiff Crystal L. Cox alleges Defendant NMAR Kalispell Montana, Defendant MAR Helena Montana, and Defendant NAR Chicago Illinois FORCING real estate brokers and brokerages to JOIN the National, State, and Local Association of Realtors in order to use the MLS database as

a Real Estate Professional, HAS violated Anti-Trust Laws, Violates Civil Conspiracy Laws and Violates tortious interference with business laws and this has directly caused Plaintiff Crystal Cox irreparable harm and damage of which Defendants are liable.

Plaintiff Crystal L. Cox alleges Defendant zipLogix conspiring with Defendants NMAR, MAR, and NAR have essential BLOCKED her from competing in the Montana Real Estate Marketplace and Plaintiff Cox is therefore allowed all available remedy allowed by law.

**Plaintiff Crystal L. Cox requests 10 Million in damages and punitive from EACH Defendant NMAR, NAR, and MAR. And 5 Million from Defendant zipLogix, which may in essence be controlled or owned by NAR.**

Plaintiff Crystal L. Cox wishes this court to grant Plaintiff all allowable relief by law.

1. that the aforesaid contract, combination, or conspiracy unreasonably restrains trade and is illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1;

2. that the defendant be restrained and enjoined from requiring or permitting its member boards or the MLSs with which they are affiliated to adopt rules implementing the opt-out provisions;

3. that the defendant be restrained and enjoined from requiring or permitting its member boards or the MLSs with which they are affiliated to adopt rules implementing the anti-referral provision;

4. that the defendant be restrained and enjoined from requiring or permitting its member boards or the MLSs with which they are affiliated to adopt rules that restrict — or condition MLS access or MLS participation rights on — the method by which a broker interacts with his or her customers, competitor brokers, or other persons or entities;

5. that the Court grant such other relief as the United States may request and the Court deems just and proper; and

6. that the Association of Realtors is forced, by this court to Stop mandatory membership

*Crystal L. Cox*

## Certificate of Service:

I hereby certify that I served the foregoing on May 13th, 2013

Mailed to:

Western District of Washington
U.S. District Court Clerk's Office
700 Stewart Street, Suite 2310
Seattle, WA 98101

Submitted Respectfully by

Crystal L. Cox
Pro Se Plaintiff

Real Estate Broker Owner
Ten Lakes Realty / Montana
Goddess Realty / Washington

**(406) 624-9510**
PO Box 2027
Port Townsend, WA 98368

Crystal@CrystalCox.com
SavvyBroker@Yahoo.com

I dissent from paragraph I.C. of the order and concur with the remainder of the order.

## STATEMENT OF COMMISSIONER ROSCOE B. STAREK, III
### CONCURRING IN PART AND DISSENTING IN PART

I concur with the decision of the Commission to accept the Consent Order with Industrial Multiple for final issuance, with the exception of paragraph I(C). I agree with the concerns expressed in Commissioner Azcuenaga's statement regarding this paragraph. The record contains very little evidence suggesting that I(C) is targeted at behavior that is likely to be anticompetitive, and an efficiency justification for the challenged conduct is at least plausible. Therefore, I cannot conclude, without a full rule of reason analysis, that the conduct challenged in paragraph I(C) of the Order violates Section 5 of the FTC Act.

Paragraph I(C) prevents Industrial Multiple from requiring that a listing agent disclose either the fact that the commission deviates from that agent's standard schedule or the amount by which the commission deviates. Disclosure of such information has at least the potential for anticompetitive effects, because it publicizes discounting practices and thereby may enable retaliatory measures against discounters. But we have almost no evidence regarding this anticompetitive potential.

My concerns are based, in significant part, on a comment submitted by the National Association of Realtors ("NAR") regarding the potential market impact of I(C). NAR argues that this order provision would prevent Industrial Multiple from requiring the disclosure of information to cooperative brokers that is material to their determination of the likelihood that they will earn a commission if they produce a buyer for a property. Cooperative brokers can more efficiently determine how to allocate their time and other resources if they are more fully informed about the potential risks and benefits of attempting to produce buyers for each property.

In a variable-rate listing, the total commission paid is lower when the seller, rather than a real estate agent, produces a buyer.[1] In the case of such listings, a co-op agent is at a competitive disadvantage. The seller would prefer an offer of a certain amount if it is received directly rather than through a co-op broker, because a lower total commission would have to be paid. The greater is the difference between the commission paid when the seller produces a buyer and the commission paid when a co-op agent produces a buyer, the greater is the risk that an offer presented by a co-op agent will be rejected. Co-op agents can better determine how to allocate their efforts the more fully informed they are about a listing's commission schedule and the incentives inherent in the listing for the listing agent, seller, and co-op agent. The required disclosure of information about a listing's commission schedule and cooperative agents, and in so doing increase the efficiency of the market.

It may be necessary for Industrial Multiple to impose a requirement to disclose such information on listing agents in order to accomplish this efficiency, because the unilateral incentives of listing agents may not result in such disclosure. Listing agents sometimes may not want to announce certain information about variable rate listings, because they are aware that some co-op brokers would not pursue sales of those properties as vigorously. The proposition that requirements to disclose information can result in people making more well-informed choices, thereby enhancing the efficient operation of markets, is not foreign to the Commission.[2]

Accordingly, I dissent from the decision to accept paragraph I(C) of the order and concur with the decision to accept the remainder of the order.

---

[1] In some instances, variable rate listings also provide for a reduced commission when the listing agent (rather than a co-op agent) produces a buyer.

[2] It is not clear from the evidence presented that Industrial Multiple's requirements here necessarily are efficient. However, the evidence does not suggest that an efficient result is any less likely than an anticompetitive outcome. Therefore, I do not have reason to believe that Industrial Multiple's required information disclosures are likely to be anticompetitive.

IN THE MATTER OF

BELLINGHAM-WHATCOM COUNTY MULTIPLE LISTING BUREAU

CONSENT ORDER, ETC., IN REGARD TO ALLEGED VIOLATION OF SEC. 5 OF THE FEDERAL TRADE COMMISSION ACT

*Docket C-3299. Complaint, Aug. 2, 1990—Decision, Aug. 2, 1990*

This consent order prohibits, among other things, a Washington state multiple listing service from refusing to publish exclusive agency or conditional listings or listings containing reserve clauses; from restricting the solicitation of homeowners with current listings for future business; and from suggesting or fixing any commission split or other fees between any listing broker and any selling broker. In addition, the order requires respondent to distribute a statement describing the provisions of the order to all its members.

## Appearances

For the Commission: *Randall H. Brook.*

For the respondent: *Stephen C. Watson,* Seattle WA.

## COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act, and by virtue of the authority vested in it by said Act, the Federal Trade Commission, having reason to believe that respondent Bellingham-Whatcom County Multiple Listing Bureau ("BWCMLB"), a corporation, has violated and is violating Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues this complaint stating its charges as follows:

PARAGRAPH 1. As used in this complaint:

(1) *"Multiple listing service"* shall mean a clearinghouse through which member real estate brokerage firms regularly exchange information on listings of real estate properties and share commissions with other members.

(2) *"Listing agreement"* shall mean any agreement between a real estate broker and a property owner for the provision of real estate brokerage services.

(3) *"Listing broker"* shall mean any broker who lists a real estate property with a multiple listing service pursuant to a listing agreement with the property owner.

(4) *"Selling broker"* shall mean any broker, other than the listing broker, who locates the purchaser for a listed property.

(5) *"Exclusive agency listing"* shall mean any listing under which a property owner appoints a broker as exclusive agent for the sale of the property personally to a direct buyer (one not procured in any way through the efforts of any broker) at an agreed reduction in the commission or with no commission owed to the agent broker.

(6) *"Exclusive right to sell listing"* shall mean any listing under which a property owner appoints a broker as exclusive agent for the sale of the property, and agrees to pay the broker an agreed commission if the property is sold, whether the purchaser is located by the broker or any other person, including the owner.

(7) *"Reserve clause listing"* shall mean any exclusive right to sell listing that includes a provision reserving the property owner's right to sell the property to one or more persons individually named in the listing agreement without owing a full commission to the broker.

(8) *"Conditional listing"* shall mean any exclusive agency or exclusive right to sell listing that makes sale of the property conditional on the purchase or sale of other property.

PAR. 2. BWCMLB is a Washington corporation with its office and principal place of business at 1801 "F" Street, Bellingham, Washington.

PAR. 3. BWCMLB is and has been at all times relevant to this complaint a corporation organized for the profit of its members within the meaning of Section 4 of the Federal Trade Commission Act, as amended, 15 U.S.C. 44.

PAR. 4. In the course and conduct of their businesses, and through the policies, acts, and practices described below, BWCMLB and its members are in or affect commerce, as "commerce" is defined in the Federal Trade Commission Act.

PAR. 5. BWCMLB is, and for some time has been, providing a multiple listing service for member real estate brokerage firms. BWCMLB maintains a computerized database of residential real estate available for sale in the Bellingham, Washington area and its

Case 3:13-cv-05364-BHS Document 1-2 Filed 05/14/13 Page 27 of 46

surroundings (BWCMLB's "service area"). It distributes the information to its members through online terminals and frequent publication of books containing property listings.

Par. 6. BWCMLB's member firms are owned and operated by real estate brokers who, for a commission, provide the service of bringing together buyers and sellers of residential real estate as well as other services designed to facilitate sales of these properties. Each BWCMLB member agrees to submit all of its exclusive right to sell listings for residential real estate located within BWCMLB's service area for publication to the entire membership of the multiple listing service, and to share commissions with those member firms that successfully locate purchasers for properties it has listed. Only members may participate in the multiple listing service.

Par. 7. Membership in BWCMLB's multiple listing service provides valuable competitive advantages in the brokering of residential real estate sales in BWCMLB's service area. Membership significantly increases the opportunities for brokerage firms to enter into listing agreements with residential property owners, and significantly reduces the costs of obtaining current and comprehensive information on listings and sales.

Par. 8. Publication of listings through BWCMLB's multiple listing service generally is considered by sellers and their brokers to be the *fastest and most effective means of obtaining the broadest market* exposure for residential property in BWCMLB's service area.

Par. 9. BWCMLB is the sole multiple listing service in the Bellingham, Washington area. The vast majority of brokers that deal in residential real estate in this area are members of BWCMLB. The vast majority of broker-assisted sales of residential real estate in this area go through BWCMLB. Sales of residential real estate listings published by BWCMLB totaled about $88 million in 1986.

Par. 10. Except to the extent that competition has been restrained as described herein, BWCMLB members are and have been in competition among themselves in the provision of residential real estate brokerage services within BWCMLB's service area.

Par. 11. In adopting the policies and engaging in the practices described in paragraphs twelve through sixteen below, BWCMLB has been and is acting as a combination of its members, or in conspiracy with some of its members, to restrain trade in the provision of residential real estate brokerage services within BWCMLB's service area.

Par. 12. BWCMLB has been and is now refusing to publish any exclusive agency listing through its multiple listing service.

Par. 13. BWCMLB has been and is now refusing to publish any reserve clause listing through its multiple listing service.

Par. 14. BWCMLB has been and is now refusing to publish any conditional listing through its multiple listing service.

Par. 15. BWCMLB has enacted a rule prohibiting any member other than the listing broker from soliciting the listing of any property, the listing of which is filed with the multiple listing service, until the filed listing has expired.

Par. 16. BWCMLB has enacted a rule providing that the listing broker receive 40% and the selling broker receive 60% of the commission due on the sale of residential real estate subject to an exclusive right to sell listing in the event that the listing broker fails to specify a selling broker's share on the listing form submitted to BWCMLB.

Par. 17. The purpose, capacity, tendency, or effect of the combination or conspiracy described in paragraphs twelve through sixteen has been, and continues to be, to restrain competition among brokers and to injure consumers by, *inter alia*:

(a) Preventing brokers from accepting certain contractual terms, such as terms that allow the property owner to pay a reduced commission or no commission if the owner sells the property other than through the broker, thereby restraining competition among brokers based on their willingness to offer or accept different contract terms that may be attractive and beneficial to consumers;

(b) Restricting brokers from competing with the listing broker and with each other to obtain renewal of listings of properties, thereby depriving owners of property of information and the advantage of price and service competition that would otherwise be offered; and

(c) Restraining competition among brokers based on their willingness to offer or accept varying commission splits, thereby depriving consumers of the advantages of competition with regard to such splits.

Par. 18. The policies, acts, practices, and combinations or conspiracies described in paragraphs eleven through sixteen above constitute unfair methods of competition or unfair acts or practices in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45. The alleged conduct, or the effects thereof, are continuing and will continue or recur in the absence of the relief requested.

Commissioner Azcuenaga dissenting with respect to paragraph 16 of the complaint and paragraph I.C of the order.

## DECISION AND ORDER

The Federal Trade Commission has initiated an investigation of certain acts and practices of Bellingham-Whatcom County Multiple Listing Bureau ("BWCMLB"), BWCMLB has been furnished with a draft of complaint which the Seattle Regional Office proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge BWCMLB with violation of the Federal Trade Commission Act.

BWCMLB, its attorney, and counsel for the Commission have executed an agreement containing a consent order, an admission by BWCMLB of all the jurisdictional facts set forth in the draft of complaint, a statement that the signing of the agreement is for settlement purposes only and does not constitute an admission by BWCMLB that the law has been violated as alleged in the complaint, and waivers and other provisions as required by the Commission's Rules.

The Commission, having thereafter considered the matter and having determined that it had reason to believe that BWCMLB has violated the Federal Trade Commission Act, and that a complaint should issue stating its charges in that respect, and having accepted the executed consent agreement and placed that agreement on the public record for a period of sixty (60) days, and having duly considered the comments filed thereafter by interested persons pursuant to Section 2.34 of its Rules, now in further conformity with the procedure prescribed in Section 2.34 of its Rules, the Commission issues its complaint, makes the following jurisdictional findings, and enters the following order.

(1) Respondent BWCMLB is a Washington corporation with its office and principal place of business at 1801 "F" Street, Bellingham, Washington.

(2) The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and the respondent, and the proceeding is in the public interest.

## ORDER

### DEFINITIONS

The following definitions shall apply to this order:

(1) "*Multiple listing service*" shall mean a clearinghouse through which member real estate brokerage firms regularly exchange information on listings of real estate properties and share commissions with other members.

(2) "*Listing agreement*" shall mean any agreement between a real estate broker and a property owner for the provision of real estate brokerage services.

(3) "*Listing broker*" shall mean any broker who lists a real estate property with a multiple listing service pursuant to a listing agreement with the property owner.

(4) "*Selling broker*" shall mean any broker, other than the listing broker, who locates the purchaser for a listed property.

(5) "*Exclusive agency listing*" shall mean any listing under which a property owner appoints a broker as exclusive agent for the sale of the property at an agreed commission, but reserves the right to sell the property personally to a direct buyer (one not procured in any way through the efforts of any broker) at an agreed reduction in the commission or with no commission owed to the agent broker.

(6) "*Reserve clause listing*" shall mean any listing that includes a provision reserving the property owner's right to sell the property to one or more persons individually named in the listing agreement without owing a full commission to the broker.

(7) "*Conditional listing*" shall mean any exclusive agency or exclusive right to sell listing that makes sale of the property conditional on the purchase or sale of other property.

(8) "*BWCMLB*" shall mean Bellingham-Whatcom County Multiple Listing Bureau and its successors, assigns, directors, officers, committees, agents, representatives, members, and employees.

I.

*It is ordered*, That respondent BWCMLB, directly or indirectly, or through any corporation, subsidiary, division, or other device, in connection with the operation of a multiple listing service in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, shall cease and desist from:

A. Restricting or interfering with:

1. The publication on BWCMLB's multiple listing service of any exclusive agency listing of a member; or

2. The publication on BWCMLB's multiple listing service of any reserve clause listing or conditional listing of a member.

B. Adopting or maintaining any policy, or taking any other action that has the purpose, tendency, or effect of restricting or interfering with the solicitation of a listing agreement for any property.

*Provided, however,* that nothing contained in this subpart shall prohibit BWCMLB from adopting or enforcing any reasonable and nondiscriminatory policy that prohibits any member from using information provided to it by BWCMLB that pertains to a specific listed property in the solicitation of a listing agreement for that property. Such reasonable and nondiscriminatory policy may include adoption of a rebuttable presumption that any member soliciting sellers for listings then listed with BWCMLB by another member used information provided to it by BWCMLB in the solicitation, as long as the soliciting member may fully rebut the presumption by providing a declaration under oath or other evidence that the solicitation was based upon information obtained from sources other than BWCMLB.

C. Suggesting or fixing any rate, range, or amount of any division or split of commission or other fees between any selling broker and any listing broker.

II.

*It is further ordered,* That BWCMLB shall:

A. Within thirty (30) days after this order becomes final, furnish an announcement in the form shown in Appendix A to each member of BWCMLB.

B. Within sixty (60) days after this order becomes final, amend its bylaws, rules and regulations, and all other of its materials to conform to the provisions of this order, and provide each member with a copy of the amended bylaws, rules and regulations, and other amended materials.

C. For a period of three (3) years after this order becomes final, furnish an announcement in the form shown in Appendix A to each new member of BWCMLB within thirty (30) days of the new member's admission.

III.

*It is further ordered,* That BWCMLB shall:

A. Within ninety (90) days after this order becomes final, submit a verified written report to the Federal Trade Commission setting forth in detail the manner and form in which BWCMLB has complied and is complying with this order.

B. In addition to the report required by paragraph III(A), annually for a period of three (3) years on or before the anniversary date on which this order becomes final, and at such other times as the Federal Trade Commission or its staff may by written notice to BWCMLB require, file a verified written report with the Federal Trade Commission setting forth in detail the manner and form in which BWCMLB has complied and is complying with this order.

C. For a period of five (5) years after this order becomes final, maintain and make available to the Commission staff for inspection and copying, upon reasonable notice, all documents that relate to the manner and form in which BWCMLB has complied with this order.

D. Notify the Federal Trade Commission at least thirty (30) days prior to any proposed change in BWCMLB, such as dissolution, assignment, or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in BWCMLB that may affect compliance obligations arising out of this order.

Commissioner Azcuenaga dissenting with respect to paragraph 16 of the complaint and paragraph I.C of the order.

APPENDIX A

[BWCMLB's Regular Letterhead]

As you may be aware, the Federal Trade Commission has entered into consent decrees with several multiple listing services in recent years. To avoid service practices that have been alleged to be unlawful restraints of trade, the litigation, Bellingham-Whatcom County Multiple Listing Bureau ("BWCMLB") has entered into such a consent agreement. The agreement is not an admission that BWCMLB or any of its members has violated any law. For your information, BWCMLB is prohibited from the following practices:

A. Restricting or interfering with:

1. the publication on BWCMLB's multiple listing service of any exclusive agency listing of a member, or

2. the publication on BWCMLB's multiple listing service of any reserve clause listing or conditional listing of a member.

B. Adopting or maintaining any policy, or taking any other action that has the purpose, tendency, or effect of restricting or interfering with the solicitation of a listing agreement for any property.

*Provided, however,* that nothing contained in this subpart shall prohibit BWCMLB from adopting or enforcing any reasonable and nondiscriminatory policy that prohibits any member from using information provided to it by BWCMLB that pertains to a specific listed property in the solicitation of a listing agreement for that property. Such reasonable and nondiscriminatory policy may include adoption of a rebuttable presumption that any member soliciting sellers for listings then listed with BWCMLB by another member used information provided to it by BWCMLB in the solicitation, as long as the soliciting member may fully rebut the presumption by providing a declaration under oath or other evidence that the solicitation was based upon information obtained from sources other than BWCMLB.

C. Suggesting or fixing any rate, range, or amount of any division or split of commission or other fees between any selling broker and any listing broker.

SEPARATE STATEMENT OF COMMISSIONER MARY L. AZCUENAGA,
CONCURRING IN PART AND DISSENTING IN PART

Although I have voted to accept the consent orders in *Bellingham-Whatcom County* and *Puget Sound Multiple Listing Association,* I have dissented from a paragraph in each complaint and the corresponding relief, because I have not found reason to believe that the rule concerning default commission splits is unlawful. The default split rule specifies how the commission shall be split between the listing and selling brokers but applies only if the listing broker fails to specify the split on the property listing form submitted to the multiple listing service. The rule does not affect the level of commissions (price), it does not mandate the division of commissions and it applies only in those apparently rare situations in which the listing broker fails to specify a split. I find it difficult to imagine how the rule could be anticompetitive, and, at the margin, the rule may speed the process of listing properties with the service and may reduce subsequent transaction costs.

733

IN THE MATTER OF

## PUGET SOUND MULTIPLE LISTING ASSOCIATION

CONSENT ORDER, ETC., IN REGARD TO ALLEGED VIOLATION OF SEC. 5 OF THE FEDERAL TRADE COMMISSION ACT

*Docket C-8300. Complaint, Aug. 2, 1990—Decision, Aug. 2, 1990*

This consent order prohibits, among other things, a Washington state multiple listing service from refusing to publish exclusive agency or listings containing reserve clauses; from restricting the solicitation of homeowners with current listings for future business; and from suggesting or fixing any commission split or other fees between any listing broker and any selling broker. In addition, the order requires respondent to distribute a statement describing the provisions of the order to all its members.

### Appearances

For the Commission: *Randall H. Brook.*

For the respondent: *Stephen C. Watson,* Seattle WA.

### COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act, and by virtue of the authority vested in it by said Act, the Federal Trade Commission, having reason to believe that respondent Puget Sound Multiple Listing Association ("PSMLA"), a corporation, has violated and is violating Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues this complaint stating its charges as follows:

PARAGRAPH 1. As used in this complaint:

(1) *"Multiple listing service"* shall mean a clearinghouse through which member real estate brokerage firms regularly exchange information on listings of real estate properties and share commissions with other members.

(2) *"Listing agreement"* shall mean any agreement between a real estate broker and a property owner for the provision of real estate brokerage services.

(3) *"Listing broker"* shall mean any broker who lists a real estate

734

FEDERAL TRADE COMMISSION DECISIONS

Complaint

113 F.T.C.

property with a multiple listing service pursuant to a listing agreement with the property owner.

(4) "Selling broker" shall mean any broker, other than the listing broker, who locates the purchaser for a listed property.

(5) "Exclusive agency listing" shall mean any listing under which a property owner appoints a broker as exclusive agent for the sale of the property at an agreed commission, but reserves the right to sell the property personally to a direct buyer (one not procured in any way through the efforts of any broker) at an agreed reduction in the commission or with no commission owed to the agent broker.

(6) "Exclusive right to sell listing" shall mean any listing under which a property owner appoints a broker as exclusive agent for the sale of the property, and agrees to pay the broker an agreed commission if the property is sold, whether the purchaser is located by the broker or any other person, including the owner.

(7) "Reserve clause listing" shall mean any exclusive right to sell listing that includes a provision reserving the property owner's right to sell the property to one or more persons individually named in the listing agreement without owing a full commission to the broker.

Par. 2. PSMLA is a Washington corporation with its office and principal place of business at 11961 124th Avenue N.E., Kirkland, Washington.

Par. 3. PSMLA is and has been at all times relevant to this complaint a corporation organized for the profit of its members within the meaning of Section 4 of the Federal Trade Commission Act, as amended, 15 U.S.C. 44.

Par. 4. In the course and conduct of their businesses, and through the policies, acts, and practices described below, PSMLA and its members are in or affect commerce, as "commerce" is defined in the Federal Trade Commission Act.

Par. 5. PSMLA is, and for some time has been, providing a multiple listing service for member real estate brokerage firms. PSMLA maintains a computerized database of residential real estate available for sale in the Seattle metropolitan area and its surroundings (PSMLA's "service area"). It distributes the information to its members through online terminals and frequent publication of books containing property listings.

Par. 6. PSMLA's member firms are owned and operated by real estate brokers who, for a commission, provide the service of bringing together buyers and sellers of residential real estate as well as other

738

PUGET SOUND MULTIPLE LISTING ASSOCIATION

Complaint

735

services designed to facilitate sales of these properties. Each PSMLA member agrees to submit all of its exclusive right to sell listings for residential real estate located within PSMLA's service area for publication to the entire membership of the multiple listing service, and to share commissions with those member firms that successfully locate purchasers for properties it has listed. Only members may participate in the multiple listing service.

Par. 7. Membership in PSMLA's multiple listing service provides valuable competitive advantages in the brokering of residential real estate listings in PSMLA's service area. Membership significantly increases the opportunities for brokerage firms to enter into listing agreements with residential property owners, and significantly reduces the costs of obtaining current and comprehensive information on listings and sales.

Par. 8. Publication of listings through PSMLA's multiple listing service generally is considered by sellers and their brokers to be the fastest and most effective means of obtaining the broadest market exposure for residential property in PSMLA's service area.

Par. 9. PSMLA is the sole multiple listing service in the Seattle metropolitan area. The vast majority of brokers that deal in residential real estate in this area are members of PSMLA. The vast majority of broker-assisted sales of residential real estate listings in this area go through PSMLA. Sales of residential real estate listings published by PSMLA totaled about $2.8 billion in 1986.

Par. 10. Except to the extent that competition has been restrained as described herein, PSMLA members are and have been in competition among themselves in the provision of residential real estate brokerage services within PSMLA's service area.

Par. 11. In adopting the policies and engaging in the practices described in paragraphs twelve through fifteen below, PSMLA has been and is acting as a combination of its members, or in conspiracy with some of its members, to restrain trade in the provision of residential real estate brokerage services within PSMLA's service area.

Par. 12. PSMLA has been and is now refusing to publish any exclusive agency listing through its multiple listing service.

Par. 13. PSMLA has been and is now refusing to publish any reserve clause listing through its multiple listing service.

Par. 14. PSMLA has enacted a rule prohibiting any member other than the listing broker from soliciting the listing of any property, the

listing of which is filed with the multiple listing service, until the filed listing has expired.

PAR. 15. PSMLA has enacted rules providing that the listing broker and selling broker each receive 50% of the commission due on the sale of residential real estate subject to an exclusive right to sell listing in the event that the listing broker fails to specify a selling broker's share on the listing form submitted to PSMLA.

PAR. 16. The purpose, capacity, tendency, or effect of the combination or conspiracy described in paragraphs twelve through fifteen has been, and continues to be, to restrain competition among brokers and to injure consumers by, *inter alia:*

(a) Preventing brokers from accepting certain contractual terms, such as terms that allow the property owner to pay a reduced commission or no commission if the owner sells the property other than through the broker, thereby restraining competition among brokers based on their willingness to offer or accept different contract terms that may be attractive and beneficial to consumers;

(b) Preventing brokers other than the listing broker from competing to obtain renewal of listings of properties, thereby depriving owners of property of information and the advantage of price and service competition that would otherwise be offered; and

(c) Restraining competition among brokers based on their willingness to offer or accept varying commission splits, thereby depriving consumers of the advantages of competition with regard to such splits.

PAR. 17. The policies, acts, practices, and combinations or conspiracies described in paragraphs eleven through fifteen above constitute unfair methods of competition or unfair acts or practices in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45. The alleged conduct, or the effects thereof, are continuing and will continue or recur in the absence of the relief requested.

Commissioner Azcuenaga dissenting with respect to paragraph 15 of the complaint and paragraph I.C. of the order.

DECISION AND ORDER

The Federal Trade Commission has initiated an investigation of certain acts and practices of Puget Sound Multiple Listing Association ("PSMLA"). PSMLA has been furnished with a draft of complaint which the Seattle Regional Office proposed to present to the

Commission for its consideration and which, if issued by the Commission, would charge PSMLA with violation of the Federal Trade Commission Act.

PSMLA, its attorney, and counsel for the Commission, have executed an agreement containing a consent order, an admission by PSMLA of all the jurisdictional facts set forth in the draft of complaint, a statement that the signing of the agreement is for settlement purposes only and does not constitute an admission by PSMLA that the law has been violated as alleged in the complaint, and waivers and other provisions as required by the Commission's Rules.

The Commission having thereafter considered the matter and having determined that it had reason to believe that PSMLA has violated the Federal Trade Commission Act, and that a complaint should issue stating its charges in that respect, and having accepted the executed consent agreement and placed that agreement on the public record for a period of sixty (60) days, and having duly considered the comments filed thereafter by interested persons pursuant to Section 2.34 of its Rules, now in further conformity with the procedure prescribed in Section 2.34 of its Rules, the Commission issues its complaint, makes the following jurisdictional findings, and enters the following order:

(1) Respondent PSMLA is a Washington corporation with its office and principal place of business at 11961 124th Avenue N.E., Kirkland, Washington.

(2) The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and the respondent, and the proceeding is in the public interest.

ORDER

DEFINITIONS

The following definitions shall apply to this order:

(1) *"Multiple listing service"* shall mean a clearinghouse through which member real estate brokerage firms regularly exchange information on listings of real estate properties and share commissions with other members.

(2) *"Listing agreement"* shall mean any agreement between a real estate broker and a property owner for the provision of real estate brokerage services.

(3) "Listing broker" shall mean any broker who lists a real estate property with a multiple listing service pursuant to a listing agreement with the property owner.

(4) "Selling broker" shall mean any broker, other than the listing broker, who locates the purchaser for a listed property.

(5) "Exclusive agency listing" shall mean any listing under which a property owner appoints a broker as exclusive agent for the sale of the property at an agreed commission, but reserves the right to sell the property personally to a direct buyer (one not procured in any way through the efforts of any broker) at an agreed reduction in the commission or with no commission owed to the agent broker.

(6) "Reserve clause listing" shall mean any listing that includes a provision reserving the property owner's right to sell the property to one or more persons individually named in the listing agreement without owing a full commission to the broker.

(7) "PSMLA" shall mean Puget Sound Multiple Listing Association and its successors, assigns, directors, officers, committees, agents, representatives, members, and employees.

I.

It is ordered, That respondent PSMLA, directly or indirectly, or through any corporation, subsidiary, division, or other device, in connection with the operation of a multiple listing service in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, shall cease and desist from:

A. Restricting or interfering with:

1. The publication on PSMLA's multiple listing service of any exclusive agency listing of a member; or

2. The publication on PSMLA's multiple listing service of any reserve clause listing of a member.

B. Adopting or maintaining any policy, or taking any other action that has the purpose, tendency, or effect of restricting or interfering with the solicitation of a listing agreement for any property.

Provided, however, that nothing contained in this subpart shall prohibit PSMLA from adopting or enforcing any reasonable and nondiscriminatory policy that prohibits any member from using information provided to it by PSMLA that pertains to a specific listed property in the solicitation of a listing agreement for that property.

Such reasonable and nondiscriminatory policy may include adoption of a rebuttable presumption that any member soliciting sellers for listings then listed with PSMLA by another member used information provided to it by PSMLA in the solicitation, as long as the soliciting member may fully rebut the presumption by providing a declaration under oath or other evidence that the solicitation was based upon information obtained from sources other than PSMLA.

C. Suggesting or fixing any rate, range, or amount of any division or split of commission or other fees between any selling broker and any listing broker.

II.

It is further ordered, That PSMLA:

A. Within thirty (30) days after this order becomes final, furnish an announcement in the form shown in Appendix A to each member of PSMLA.

B. Within sixty (60) days after this order becomes final, amend its bylaws, rules and regulations, and all other of its materials to conform to the provisions of this order, and provide each member with a copy of the amended bylaws, rules and regulations, and other amended materials.

C. For a period of three (3) years after this order becomes final, furnish an announcement in the form shown in Appendix A to each new member of PSMLA within thirty (30) days of the new member's admission.

III.

It is further ordered, That PSMLA shall:

A. Within ninety (90) days after this order becomes final, submit a verified written report to the Federal Trade Commission setting forth in detail the manner and form in which PSMLA has complied and is complying with this order.

B. In addition to the report required by paragraph III(A), annually for a period of three (3) years on or before the anniversary date on which this order becomes final, and at such other times as the Federal Trade Commission or its staff may by written notice to PSMLA require, file a verified written report with the Federal Trade

Commission setting forth in detail the manner and form in which PSMLA has complied and is complying with this order.

C. For a period of five (5) years after this order becomes final, maintain and make available to the Commission staff for inspection and copying, upon reasonable notice, all documents that relate to the manner and form in which PSMLA has complied with this order.

D. Notify the Federal Trade Commission at least thirty (30) days prior to any proposed change in PSMLA, such as dissolution, assignment, or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in PSMLA that may affect compliance obligations arising out of this order.

Commissioner Azcuenaga dissenting with respect to paragraph 15 of the complaint and paragraph I.C of the order.

APPENDIX A

[PSMLA's Regular Letterhead]

As you may be aware, the Federal Trade Commission has entered into consent decrees with several multiple listing services in order to halt certain multiple listing service practices that have been alleged to be unlawful restraints of trade. To avoid litigation, Puget Sound Multiple Listing Association ("PSMLA") has entered into such a consent agreement. The agreement is not an admission that PSMLA or any of its members has violated any law. For your information, PSMLA is prohibited from the following practices:

A. Restricting or interfering with:

1. the publication on PSMLA's multiple listing service of any exclusive agency listing of a member; or

2. the publication on PSMLA's multiple listing service of any reserve clause listing of a member.

B. Adopting or maintaining any policy, or taking any other action that has the purpose, tendency, or effect of restricting or interfering with the solicitation of a listing agreement for any property;

Provided, however, that nothing contained in this subpart shall prohibit PSMLA from adopting or enforcing any reasonable and nondiscriminatory policy that prohibits any member from using information provided to it by PSMLA that pertains to a specific listed property in the solicitation of a listing agreement for that property. Such reasonable and nondiscriminatory policy may include adoption of a rebuttable presumption that any member soliciting sellers for listings then listed with PSMLA by another member used information provided to it by PSMLA in the solicitation, as long as the soliciting member may fully rebut the presumption by providing a declaration under oath or other evidence that the solicitation was based upon information obtained from sources other than PSMLA.

C. Suggesting or fixing any rate, range, or amount of any division or split of commission or other fees between any selling broker and any listing broker.

SEPARATE STATEMENT OF COMMISSIONER MARY L. AZCUENAGA, CONCURRING IN PART AND DISSENTING IN PART

Although I have voted to accept the consent orders in *Bellingham-Whatcom County* and *Puget Sound Multiple Listing Association*, I have dissented from a paragraph in each complaint and the corresponding relief, because I have not found reason to believe that the rule concerning default commission splits is unlawful. The default split rule specifies how the commission shall be split between the listing and selling brokers but applies only if the listing broker fails to specify the split on the property listing form submitted to the multiple listing service. The rule does not affect the level of commissions (price), it does not mandate the division of commissions and it applies only in those apparently rare situations in which the listing broker fails to specify a split. I find it difficult to imagine how the rule could be anticompetitive, and, at the margin, the rule may speed the process of listing properties with the service and may reduce subsequent transaction costs.



# Competition in the Real Estate Marketplace

Overview

**Case Filings**

Competition News

Case Filings

Advocacy & Outreach

Workshops

Map Links

Resources

Consumer Education

*Multiple Listing Service, Inc.*, Docket No. C-4215 (2007): Milwaukee

The Commission's complaint alleged that Multiple Listing Service, Inc., the only MLS in the Milwaukee area with over 6500 members, adopting anticompetitive rules and policies that limited the publication and marketing of certain sellers' properties based solely on the terms of their respective listing contracts. Information about properties was not made available on popular real estate web sites unless the listing contracts follow the traditional format approved by MLS. When implemented, according to the FTC, these restrictions prevented Exclusive Agency Listings from being displayed on a broad range of public Web sites, including Realtor.com and the MLS's local wihomes.com site. The consent order settling these charges prohibits MLS from adopting or enforcing any rules or policies that deny or limit the ability of its participants to enter into Exclusive Agency Listings, or any other lawful listing agreements, with property sellers.

***In the Matter of West Penn Multi-List, Inc.*, Docket No. C-4247 (2009): Pittsburgh Area**

The consent order prohibits Respondent, the only MLS in the Pittsburgh area, from adopting or enforcing any rules or policies that limit publication and marketing of the listing of sellers' properties based solely on the terms of the seller's listing contract with the real estate broker. In particular, the West Penn, with its 6800 members, is barred from refusing to make available for viewing on popular Internet Web sites any type of listing other than the traditional full-service style of real estate broker listing agreement, which is typically associated with a non-discounted commission. The FTC alleged these restrictions favored traditional full-service brokerage agreements, in which a property owner appoints a real estate broker for a set period of time as an exclusive agent to sell the property, and agrees to pay the listing broker a commission if and when the property is sold. The restrictions effectively blocked brokers from offering an alternative form of listing agreement, which could be used by home sellers who do not want to pay for the full range of brokerage services. The FTC charged that these rules illegally restrained trade and harmed competition

***In the Matter of MiRealSource, Inc.*, Docket No. 9321 (2007): Southeastern Michigan**

The consent order prohibits the respondent, organized by competing real estate brokers, from restraining competition in real estate brokerage services through the operation of its multiple listing service or "MLS." The consent order settles charges filed by the Commission in 2006 that the respondent violated Section 5 of the FTC Act by adopting several MLS policies intended to stifle competition from real estate brokers using alternative business models to provide brokerage services. These included: (1) a policy excluding certain non-traditional residential real estate listings entirely from the MLS; (2) a policy limiting the publication of certain residential real estate listings on popular real estate web sites; (3) a policy requiring a listing broker to perform a minimum set of services; (4) a policy requiring each MLS member to have an office in the state of Michigan; (5) a policy restricting how and where home sellers could advertise and market their homes; and (6) a policy restricting MLS

listing information from being searched on public web sites alongside listing information from other sources. The consent order prohibits such conduct and prohibits the respondent from adopting or enforcing any other unjustified rules or policies that deny the services of the MLS to lawful but non-traditional listings in any way that such services are not denied to traditional property listings.

***In the Matter of Realcomp II Ltd.***, Docket No. 9320 (2006): Southeastern Michigan

> This contested complaint charges the respondent, organized by groups of
> competing real estate brokers, with restraining competition in real estate brokerage
> services through the operation of its multiple listing service or "MLS," which is the
> largest in the State of Michigan. The complaint charges that the respondent violated
> *Section 5 of the FTC Act by adopting MLS policies intended to stifle competition from*
> real estate brokers using alternative business models to provide brokerage
> services. These are (1) a policy to feed MLS information to publicly accessible
> internet sites about certain properties, but not others, based solely on the terms of
> the listing contract entered into by the property seller with his or her real estate
> broker; and (2) a policy that the MLS search screen used by participating MLS
> members defaults to traditional Exclusive Right to Sell Listings. The complaint
> seeks entry of an order that prohibits such conduct and prohibits the respondent
> from adopting or enforcing any other unjustified rules or policies that deny the
> services of the MLS to lawful but non-traditional listings in any way that such services
> are not denied to traditional property listings.

***In the Matter of Information and Real Estate Services, LLC***, Docket No. C-4179 (2006): Northern
Colorado including Boulder, Fort Collins, Greeley, Longmont, and Loveland/Berthoud

> The consent order prohibits the respondent, organized by groups of competing real
> estate brokers, from restraining competition in real estate brokerage services
> through the operation of its multiple listing service or "MLS." The consent order
> settles charges that the respondent violated Section 5 of the FTC Act by adopting a
> policy to feed MLS information to publicly accessible internet sites about certain
> properties, but not others, based solely on the terms of the listing contract entered
> into by the property seller with his or her real estate broker. This policy prevented
> properties with non-traditional forms of listing contracts from being displayed on a
> broad range of public web sites. The consent order prohibits the respondent from
> adopting or enforcing any unjustified rules or policies that deny the services of the
> MLS to lawful but non-traditional listings in any way that such services are not denied
> to traditional property listings

***In the Matter of Northern New England Real Estate Network, Inc.***, Docket No. C-4175 (2006):
New Hampshire and some surrounding areas

> The consent order prohibits the respondent, organized by groups of competing real
> estate brokers, from restraining competition in real estate brokerage services
> through the operation of its multiple listing service or "MLS." The consent order
> settles charges that the respondent violated Section 5 of the FTC Act by adopting a
> policy to feed MLS information to publicly accessible internet sites about certain
> properties, but not others, based solely on the terms of the listing contract entered
> into by the property seller with his or her real estate broker. This policy prevented
> properties with non-traditional forms of listing contracts from being displayed on a
> broad range of public web sites. The consent order prohibits the respondent from
> adopting or enforcing any unjustified rules or policies that deny the services of the
> MLS to lawful but non-traditional listings in any way that such services are not denied
> to traditional property listings

***In the Matter of Williamsburg Area Association of Realtors, Inc.***, Docket No. C-4177 (2006):
Williamsburg, Virginia

> The consent order prohibits the respondent, a group of competing real estate
> brokers, from restraining competition in real estate brokerage services through the
> operation of its multiple listing service or "MLS." The consent order settles charges

> that the respondent violated Section 5 of the FTC Act by adopting a policy to feed MLS
> information to publicly accessible internet sites about certain properties, but not
> others, based solely on the terms of the listing contract entered into by the property
> seller with his or her real estate broker. This policy indicated that properties with
> non-traditional forms of listing contracts would not be displayed on a broad range of
> public web sites. The consent order prohibits the respondent from adopting or
> enforcing any unjustified rules or policies that deny the services of the MLS to lawful
> but non-traditional listings in any way that such services are not denied to traditional
> property listings

*In the Matter of Realtors Association of Northeast Wisconsin, Inc.,* Docket N. C-4178 (2006): Green Bay, Appleton, Oshkosh, and Fond du Lac, Wisconsin, and the surrounding counties

The consent order prohibits the respondent, a group of competing real estate brokers, from restraining competition in real estate brokerage services through the operation of its multiple listing service or "MLS." The consent order settles charges that the respondent violated Section 5 of the FTC Act by adopting a policy to feed MLS information to publicly accessible internet sites about certain properties, but not others, based solely on the terms of the listing contract entered into by the property seller with his or her real estate broker. This policy prevented properties with non-traditional forms of listing contracts from being displayed on a broad range of public web sites. The consent order prohibits the respondent from adopting or enforcing any unjustified rules or policies that deny the services of the MLS to lawful but non-traditional listings in any way that such services are not denied to traditional property listings

*In the Matter of Monmouth County Association of Realtors*; Docket No. C-4176 (2006): Monmouth and Ocean Counties, New Jersey

The consent order prohibits the respondent, a group of competing real estate brokers, from restraining competition in real estate brokerage services through the operation of its multiple listing service or "MLS." The consent order settles charges that the respondent violated Section 5 of the FTC Act by adopting a policy to feed MLS information to publicly accessible internet sites about certain properties, but not others, based solely on the terms of the listing contract entered into by the property seller with his or her real estate broker. This policy prevented properties with non-traditional forms of listing contracts from being displayed on a broad range of public web sites. The consent order prohibits the respondent from adopting or enforcing any unjustified rules or policies that deny the services of the MLS to lawful but non-traditional listings in any way that such services are not denied to traditional property listings

*In the Matter of Austin Board of Realtors*, Docket No. C-4167 (2006): Austin, Texas

The consent order prohibits ABOR from adopting or enforcing any policy to deny, restrict, or interfere with the ability of its members or ACTRIS participants to enter into Exclusive Agency Listings or other lawful agreements with property sellers. ABOR is prohibited from preventing its members or ACTRIS participants from: (1) offering or accepting Exclusive Agency Listings or other lawful listing agreements; (2) cooperating with listings brokers or agents that offer or accept Exclusive Agency Listings or other lawful listing agreements; or (3) publishing Exclusive Agency Listings or other lawful listing agreements on Web sites otherwise approved to use ACTRIS information. The order also bars ABOR from denying or restricting the services of the ACTRIS to Exclusive Agency Listings or other lawful listings in any way that such services are not denied or restricted to Exclusive Right to Sell Listings; or treating Exclusive Agency Listings – or any other lawful listings – in a less advantageous manner than Exclusive Right to Sell Listings.

*In the Matter of Puget Sound Multiple Listing Association,* Docket No. C-3300 (1990): Seattle metropolitan area, Washington

This consent order prohibits, among other things, a Washington state multiple

listing service from refusing to publish exclusive agency or listings containing reserve clauses; from restricting the solicitation of homeowners with current listings for future business; and from suggesting or fixing any commission split or other fees between any listing broker and any selling broker. In addition, the order requires respondent to distribute a statement describing the provisions of the order to all its members.

*In the Matter of Port Washington Real Estate Board, Inc.,* Docket No. C-3227, 120 F.T.C. 882 (1995): Port Washington, New York

This consent order prohibits, among other things, a New York brokerage service from restricting the use of exclusive agency listings, fixing commission splits between listing and selling brokers, restricting or prohibiting members from holding open houses or using "For Sale" signs, restricting brokers from advertising free services to property owners, and excluding from memberships brokers who do no operate a full-time office in the territory served by the Board's multiple listing service

Case 3:13-cv-05364-BHS   Document 1-2   Filed 05/14/13   Page 39 of 46

operate a full-time office in the territory served by the Board's multiple listing service.

***In the Matter of United Real Estate Brokers of Rockland, Ltd.,*** Docket No. C-3461, 116 F.T.C. 972 (1993): Rockland County, New York

> This consent order prohibits, among other things, the New York provider of real estate brokerage services from restricting exclusive-agency listings; restricting brokers from soliciting homeowners with current listings for future business; interfering with the cancellation of a listing; and excluding from membership brokers who do not operate a full-time office, or maintain an office in Rockland County, or who are not residents of New York state.

***In the Matter of American Industrial Real Estate Association,*** Docket No. C-3449, 116 F.T.C. 704 (1993): greater metropolitan Los Angeles area, California

> This consent order prohibits, among other things, a Los Angeles area multiple listing service ("MLS") specializing in industrial properties from conditioning broker membership in the MLS or being primarily engaged in industrial real estate brokerage, or on the amount of industrial real estate experience the brokers have, or on the dollar volume of their business. In addition, the agreement prohibits the respondents from restricting any broker's offering or accepting any exclusive agency listing, or requiring disclosure of commissions that deviate from normal commission rates.

***In the Matter of Realty Computer Associates, Inc.,*** Docket No. C-3227, 115 F.T.C. 968 (1992): Clay and Platte counties, Missouri, and surroundings

> Realty Computer agreed not to limit certain business practices of its member brokers. Realty Computer provides computerized multiple listings of available real estate properties in Clay and Platte Counties, Missouri to member real estate brokers. According to the complaint issued with the consent order, Computer Listing Service conspired with its members to refuse to publish exclusive agency listings that allow homeowners to waive all commissions or pay a reduced commission whenever homeowners sell their properties without the assistance of a broker. The complaint further alleged that Computer Listing Service required its members to engage in real estate brokerage full time and also to maintain a real estate office in the Clay and Platte County service area. Finally, the complaint alleged that the firm's restrictions on the delivery of real estate brokerage services and membership requirements have reduced consumers' ability to negotiate different agreements that facilitate the sale of residential property and have suppressed competition from part-time brokers located outside the Computer Listing Service area.

***In the Matter of Florence Multiple Listing Service, Inc.,*** Docket No. C-3228, 110 F.T.C. 493 (1992): Florence and Darlington counties, South Carolina

> Florence Multiple Listing Service, Inc. agreed to settle charges that it restrained competition among residential real estate brokers by restricting membership. The complaint accompanying the consent agreement alleged that the service told prospective members that as conditions of membership, they must own a real estate business for at least six months before application, agree not to join another multiple listing service, agree not to compete with Florence, and are subject to a two-thirds vote of acceptance by the existing membership. It was charged that Florence's actions limited consumers' ability to choose among a variety of firms competing over price, terms and services and limited competition.

***In the Matter of Bellingham-Whatcom County Multiple Listing Bureau,*** Docket No. C-3299 (1990): Bellingham, Washington, area and surroundings

> This consent order prohibits, among other things, a Washington state multiple listing service from refusing to publish exclusive agency or conditional listings or listings containing reserve clauses; from restricting the solicitation of homeowners with current listing for future business; and from suggesting or fixing any commission split or other fees between any listing broker and any selling broker. In addition, the order requires respondent to distribute a statement describing the provisions of the order to all its members.

***In the Matter of Metro MLS, Inc.,*** Docket No. C-3286, 115 F.T.C. 305 (1990): the cities of Virginia Beach and Norfolk and parts of the city of Chesapeake, Virginia

Metro MLS, Inc., agreed not to restrict or limit the publication of exclusive agency listings on its multiple listing service. The complaint accompanying the consent agreement charged that Metro MLS of Virginia Beach, Virginia restrained competition by refusing to publish listings that would allow the seller to eliminate or reduce the commission usually paid to the real estate broker for the sale. The order allows Metro to identify a property listing on its multiple listing service as one granting an exclusive agency.

*In the Matter of Multiple Listing Service Mid County, Inc.,* Docket No. C-3227, 110 F.T.C. 482 (1988): Brooklyn, New York

Multiple Listing Service Mid County, Inc., of Brooklyn, New York, agreed to end various practices that have allegedly restrained price and service competition among residential real estate brokers. Under the agreement, Mid County is prohibited from requiring that any applicant or member operate a full-time office, fixing any division of commission between selling and listing brokers, adopting policies for exclusive agency listings, requiring members to inform Mid County of the commission agreed to between a listing broker and a homeowner, and adopting policies that delay the solicitation of a listing agreement.

*In the Matter of Orange County Board of Realtors, Inc.,* Docket No. C-3162, 106 F.T.C. 88 (1985): Orange County, New York

The Orange County Board of Realtors, Inc. agreed to include listings in its multiple listing service that allow property owners and brokers to enter into contracts permitting owners to pay either a reduced commission or no commission at all if the owner locates the buyer independent of the appointed broker. Such contracts are called exclusive agency listings. The complaint accompanying the consent alleged that the board and its wholly-owned subsidiary, the Multiple Listing Service of the Orange County Board of Realtors, Inc., restrained competition among its members by restricting its multiple listing service to listings giving its members exclusive rights to sell the properties. Contracts accepted under the exclusive right to sell enable the broker, appointed by the property owner, to act as the exclusive agent for the sale of residential property and to receive an agreed commission from the property owner regardless of whether the property is sold by the broker, the owner, or some other person. Under terms of the order, the board and its MLS are prohibited from interfering with a broker's acceptance of any exclusive agency listing and may not to publish the listing in their multiple listing service. In addition, the two organizations are required to publish exclusive agency listings in the same manner and category as exclusive right to sell listings.

*In the Matter of Multiple Listing Service of the Greater Michigan City Area, Inc.,* Docket No. C-3163, 106 F.T.C. 95 (1985): LaPorte County, Indiana

Under terms of a revised consent agreement, the Multiple Listing Service of the Greater Michigan City Area, Inc. of Michigan City, Indiana, is required to publish exclusive agency listings. The consent settled charges that the Multiple Listing Service restrained competition in LaPorte County, Indiana, by interfering with its member-real estate brokers' participation in truthful comparative advertising of commission fees and practices. After the Commission received and considered public comments, it voted to revise its proposed complaint and include new provisions in a provisional consent agreement that had previously been published for public comment; the new provision requires the Multiple Listing Service to include both exclusive right to sell and exclusive agency listings on its property listings. The revised complaint included allegations that the Multiple Listing Service also reduced competition among brokers and between brokers and sellers of real property in LaPorte County by continuing to publish exclusive agency listings on its multiple listing service. Exclusive right to sell contracts allow the real estate broker to receive a commission on the sale of real property regardless of who sells the property.

**Last Updated:** Monday, July 13, 2009 3:36 PM



About Us | Contact Us | Jobs | No FEAR Act Data | Performance and Accountability Report | FOIA | Site Map
Website Policies | Accessibility | Privacy Policy | Browser Plug-ins | Related Sites | USA.gov | For FTC Staff

www.ftc.gov/bc/realestate/cases/index.htm

5/6

704    FEDERAL TRADE COMMISSION DECISIONS

Complaint    116 F.T.C.

IN THE MATTER OF

AMERICAN INDUSTRIAL REAL ESTATE ASSOCIATION, ET AL.

CONSENT ORDER, ETC., IN REGARD TO ALLEGED VIOLATION OF SEC. 5 OF THE FEDERAL TRADE COMMISSION ACT

*Docket C-3449, Complaint, July 6, 1993—Decision, July 6, 1993*

This consent order prohibits, among other things, a Los Angeles area multiple listing service ("MLS") specializing in industrial properties from conditioning broker membership in the MLS on being primarily engaged in industrial real estate brokerage, or on the amount of industrial real estate experience the brokers have, or on the dollar volume of their business. In addition, the agreement prohibits the respondents from restricting any broker's offering or accepting any exclusive agency listing, or requiring disclosure of commissions that deviate from normal commission rates.

*Appearances*

For the Commission: *Paul R. Roark.*

For the respondents: *Elfot G. Disner, Shapiro, Posell, Rosenfeld & Close,* Los Angeles, CA.

COMPLAINT

Pursuant to the provisions of the Federal Trade Commission Act, and by virtue of the authority vested in it by said Act, the Federal Trade Commission, having reason to believe that American Industrial Real Estate Association ("A.I.R."), a corporation, and The Industrial Multiple ("Multiple"), a corporation, hereinafter sometimes referred to as respondents, have violated the provisions of said Act, and it appearing to the Commission that a proceeding by it in respect thereof would be in the public interest, hereby issues its complaint, stating its charges as follows:

704    AMERICAN INDUSTRIAL REAL ESTATE ASSOC., ET AL.    705

Complaint

PARAGRAPH 1. Respondents American Industrial Real Estate Association and The Industrial Multiple are corporations organized, existing, and doing business under and by virtue of the laws of the State of California. Respondents' principal office and place of business are at 345 Figueroa Street, Suite M1, Los Angeles, CA.

PAR. 2. Each respondent is now and has been at all times relevant herein a corporation organized in substantial part for the profit of its members within the meaning of Section 4 of the Federal Trade Commission Act, 15 U.S.C. 44.

PAR. 3. Respondent A.I.R. controls the acts and practices of its wholly-owned subsidiary, respondent Multiple. Only members of the A.I.R. may be members of the Multiple. Respondents coordinate and act together in carrying out the business of the Multiple.

PAR. 4. Respondents are now, and since 1962 have been, providing a multiple listing service for their members, who are real estate brokers. Only member firms may participate in respondents' multiple listing service. Each member of the Multiple agrees to submit all of his or her firm's exclusive right to sell or lease listings of industrial properties of 5,000 or more square feet in the greater metropolitan Los Angeles area (the Multiple's "service area") for publication on respondents' multiple listing service to the entire membership of the Multiple, and, unless otherwise agreed in writing, to share any brokerage commissions due with any member whose firm successfully locates a purchaser or lessee for any property so listed. Exclusive right to sell or lease listings are those under which a property owner appoints a broker as exclusive agent for the sale or lease of the property and agrees to pay the broker an agreed commission if the property is sold or leased, regardless of who locates the purchaser or lessee. In contrast, exclusive agency listings are those under which the property seller or lessor appoints a broker as exclusive agent, but reserves the right to sell or lease the property personally to a purchaser or lessee that a broker did not find with no commission owed. Variable rate listings are those under which the property seller or lessor appoints a broker as exclusive agent, but where the broker agrees to accept a reduction in the total commis-

sion due where the property owner or lessor finds the purchaser or lessee.

PAR. 5. The Industrial Multiple is, in its service area, the sole MLS that distributes significant numbers of industrial property listings throughout the area, the sole MLS that specializes in industrial property listings, and the sole MLS to which the vast majority of major industrial brokerage firms in Los Angeles belong. The vast majority of real estate broker-assisted sales and leases of industrial properties in its service area go through the Multiple. In 1985 it was the clearinghouse for over 4,500 listings, disseminating information on more than 35,000,000 square feet of buildings and 60,000,000 square feet of land. In 1987 the Multiple had over 120 member firms.

PAR. 6. Publication of listings through respondents' MLS generally is considered by sellers, lessors, and their brokers to be the fastest and most effective means of obtaining the broadest market exposure for industrial property in the Multiple's service area.

PAR. 7. Membership in respondents' MLS provides valuable competitive advantages in the brokering of industrial properties in the Multiple's service area. Membership significantly increases the opportunities for brokerage firms to enter into listing agreements with industrial property sellers and lessors, and significantly reduces the costs of obtaining current and comprehensive information on industrial property listings and sales.

PAR. 8. In the course and conduct of their businesses, and through the policies, acts, and practices described below, the respondents and their members are in or affect commerce, as "commerce" is defined in the Federal Trade Commission Act.

PAR. 9. Except to the extent that competition has been restrained as described herein, respondents' members are and have been in competition among themselves in the provision of industrial real estate brokerage services within the Multiple's service area.

PAR. 10. In adopting the policies and engaging in the practices described in paragraphs eleven through seventeen below, and in adopting and enforcing the rules and regulations of the Multiple dated November 30, 1982, and the by-laws of A.I.R. dated October

17, 1984, effective on December 1, 1984, respondents have been and are acting as a combination of their members, or in agreement with each other and with some of their members, to restrain trade in the provision of industrial real estate brokerage services within the Multiple's service area. The by-laws of A.I.R. indirectly apply to the members of the Multiple in that membership in A.I.R. is a prerequisite to membership in the Multiple.

PAR. 11. Respondents, through Multiple rule I.B.l.a., among other rules and regulations, have excluded from membership in the Multiple licensed brokers, otherwise qualified, who were not "primarily" engaged in industrial real estate. Respondents have excluded brokers who were actively engaged in industrial real estate brokerage but who were also engaged to a significant extent, as independent brokers, in selling and/or leasing properties that were not industrial properties.

PAR. 12. Respondents, through A.I.R. by-law II.A.1.(B), among other rules and regulations, have required applicants to have been involved in a minimum number of industrial property transactions, as established from time to time by the Board of Directors, in the two years prior to application to qualify for membership in the Multiple. From November 1984 through December 1986, respondents required applicants to have been involved in a minimum of sixteen transactions in the two years prior to application.

PAR. 13. Respondents, through A.I.R. by-law II.A.1.(B), among other rules and regulations, have required applicants to have been involved in a minimum dollar volume of industrial property transactions, as established from time to time by the Board of Directors, in the two years prior to application to qualify for membership in the Multiple. From November 1984 through December 1986, the minimum dollar volume required by respondents was $4 million.

PAR. 14. Respondents, through A.I.R. by-law II.A.1.(B), among other rules and regulations, have required applicants to have four years experience selling industrial real estate as a licensed broker or salesperson to qualify for membership in the Multiple.

PAR. 15. Respondents have applied their rules and regulations in an unreasonably discriminatory fashion to deny access to the Multiple to qualified brokers whom respondents wanted for some reason to exclude. For example, in determining whether applicants have met the minimum number and dollar volume of industrial transactions, as required by A.I.R. by-law II.A.1.(B), respondents have determined that properties are not "industrial" for some applicants, and have thus excluded those applicants, when similar properties were found to be "industrial" and thus counted toward the minimum number and dollar volume requirements for other applicants.

PAR. 16. Respondents, through Multiple rule II.A.2.c., among other rules and regulations, have prohibited their members from accepting exclusive agency listings for any industrial property of 5,000 square feet or more within the Multiple's service area, and have refused to publish any exclusive agency listing through their multiple listing service, thus restricting the multiple listing service to exclusive right to sell or lease listings. In addition, although respondents' rules do not prohibit publication of variable rate listings, respondents have suppressed their acceptance and publication.

PAR. 17. Respondents have required that a listing broker disclose the total commission to which he or she has agreed, not just the commission that the listing broker is offering to cooperating brokers for procuring a buyer or lessee. In particular, Multiple rule III.A.6. requires that a member publicize to all other members any departure from the member firm's standard fee schedule.

PAR. 18. The purposes, effects, tendency, or capacity of the combination or agreement described in paragraphs eleven through seventeen above have been and are to restrain competition in one or more of the following ways, among others:

a. By preventing the entry of brokers and brokerage firms into the Multiple based on rules and regulations not reasonably related to the efficient operation of the MLS, thereby depriving consumers of the advantages of competition that would result from the excluded brokers having access to the M.L.S;

b. By preventing brokers from accepting certain contractual terms, such as terms that allow the property seller or lessor to pay no commission if the seller or lessor sells or leases the property other than through the broker, thereby restraining competition among brokers based on their willingness to offer or accept different contract terms that may be attractive and beneficial to consumers;

c. By limiting the ability of property sellers and lessors to compete against real estate brokers in finding purchasers and lessees;

d. By reducing the likelihood of discounting or other price competition among members of the Multiple.

PAR. 19. The policies, acts, practices, and combinations or agreements described in paragraphs eleven through seventeen above constitute unfair methods of competition and unfair acts or practices in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. 45. These acts and practices, or the effects thereof, are continuing and will continue or recur in the absence of the relief herein requested.

## DECISION AND ORDER

The Federal Trade Commission having initiated an investigation of certain acts and practices of the respondents named in the caption hereof, and the respondents having been furnished thereafter with a copy of a draft of complaint which the Los Angeles Regional Office proposed to present to the Commission for its consideration and which, if issued by the Commission, would charge respondents with violation of the Federal Trade Commission Act; and

The respondents, their attorney, and counsel for the Commission *having thereafter executed an agreement containing a consent order, an admission by the respondents of all the jurisdictional facts set forth in the aforesaid draft of complaint, a statement that the signing of said agreement is for settlement purposes only and does not constitute an admission by respondents that the law has been*

violated as alleged in such complaint, and waivers and other provisions as required by the Commission's Rules; and

The Commission having considered the matter and having determined that it had reason to believe that the respondents have violated the said Act, and that complaint should issue stating its charges in that respect, and having thereupon accepted the executed consent agreement and placed such agreement on the public record for a period of sixty (60) days, and having duly considered the comments filed thereafter by interested persons pursuant to Section 2.34 of its Rules, now in further conformity with the procedure prescribed in Section 2.34 of its Rules, the Commission hereby issues its complaint, makes the following jurisdictional findings and enters the following order:

1. Respondents American Industrial Real Estate Association and The Industrial Multiple are corporations organized, existing, and doing business under and by virtue of the laws of the State of California. Respondents' principal office and place of business are at 345 Figueroa Street, Suite M1, Los Angeles, CA.

2. The Federal Trade Commission has jurisdiction of the subject matter of this proceeding and of the respondents, and the proceeding is in the public interest.

ORDER

DEFINITIONS

The following definitions shall apply to this order:

1. "*Applicant*" shall mean any broker who is duly licensed by the State of California as a real estate broker within the State of California and who has applied on behalf of his or her firm for membership in respondents' multiple listing service.

2. "*Exclusive agency listing*" shall mean any listing under which the property seller or lessor appoints a broker as exclusive agent for the sale or lease of the property at an agreed commission,

but reserves the right to sell or lease the property personally to a direct purchaser or lessee (one not procured in any way through the efforts of any broker) with no commission owed.

3. "*Industrial property*" or "*industrial real estate*" shall mean land and/or buildings used for, or intended at the time of listing to be used for, such purposes as manufacturing, warehousing, distribution, research and development, data processing, and activities related to such industrial uses, rather than by businesses that deal primarily with the general public, and having a minimum area of 5,000 square feet.

4. "*Listing agreement*" or "*listing*" shall mean any agreement between a real estate broker and a property seller or lessor for the provision of real estate brokerage services.

5. "*Member*" shall mean any real estate brokerage firm that is entitled to participate in the multiple listing service offered by respondents.

6. "*Multiple listing service*" or "*MLS*" shall mean a clearinghouse through which member real estate brokerage firms exchange information on listings of real estate properties and share commissions with members who locate purchasers or lessees.

7. "*Variable rate listing*" shall mean any listing under which the property seller or lessor appoints a broker as exclusive agent for the sale or lease of the property, but where the broker agrees to accept a reduction in the total commission due where the property owner or lessor finds the purchaser or lessee.

I.

*It is ordered*, That each respondent, and its successors, assigns, directors, officers, committees, representatives, agents, or employees, directly, indirectly, or through any device, in or in connection with the operation of a multiple listing service in or affecting commerce, as "commerce" is defined in the Federal Trade Commission Act, shall cease and desist from:

A. Adopting, maintaining, or enforcing any by-law, rule, regulation, policy, agreement or understanding, or taking any other action that has the purpose, tendency, or effect of conditioning membership in The Industrial Multiple or use of respondents' MLS on:

1. An applicant: (a) being primarily engaged in industrial real estate brokerage, (b) receiving a specified percentage of income from industrial real estate commissions, or (c) having a specified percentage of his or her real estate transactions involve industrial property;

2. An applicant having completed, listed, or otherwise been involved with any minimum number or minimum dollar volume of industrial real estate sales or leases over any period of time;

3. An applicant having been engaged in industrial real estate brokerage for any period of time; or

4. Any criterion that is applied in an unreasonably discriminatory manner.

B. Restricting or interfering with:

1. Any broker's offering or accepting any exclusive agency listing or variable rate listing;

2. The publication on respondents' MLS of any exclusive agency listing in any way other than by requiring designation of the listing as one granting an exclusive agency or by imposing terms applicable to all listings accepted for publication by respondents' MLS; or

*Provided, however,* that nothing contained in this order shall prohibit respondents from adopting or enforcing any non-discriminatory policy to assure that its members are, and hold themselves out to the public as being, actively engaged in and competent in industrial real estate brokerage and that listings published on respondents' multiple listing service are adequately serviced.

3. The publication on respondents' MLS of any variable rate listing in any way other than by requiring designation of the listing as one granting a variable rate or by imposing terms applicable to all listings accepted for publication by respondents' MLS.

*Provided, however,* that nothing contained in this order shall prohibit respondents from adopting or enforcing reasonable and non-discriminatory rules requiring that exclusive agency listing contracts, as a condition for publication through The Industrial Multiple, contain clauses providing that any dispute between the parties of the contract over who was the procuring cause of a buyer or lessee for the listed property shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association.

C. Adopting, maintaining, or enforcing any policy or taking any other action that has the purpose, tendency, or effect of:

1. Requiring any broker that charges a commission that deviates from that broker's normal commission schedule to disclose the specific deviation or the fact of a deviation to other brokers or either of the respondents; or

2. Requiring that members disclose to other members or the respondents any information regarding the commission rates or fees to be paid by sellers or lessors.

*Provided, however,* that nothing contained in this subpart shall prohibit respondents from publishing or otherwise distributing to or among members of respondents' MLS the rate or amount of commission to be paid to a non-listing broker for a particular transaction.

II.

*It is further ordered,* That respondents shall:

A. Within thirty (30) days after this order becomes final, furnish a copy of this order to each of their members, and to each applicant who has been denied membership in respondents' MLS since January 1, 1984.

B. Within sixty (60) days after this order becomes final, amend their by-laws, rules and regulations, and all other of their materials to conform to the provisions of this order, and provide each member with a copy of the amended by-laws, rules and regulations, and other amended materials.

C. For a period of three (3) years after this order becomes final, furnish a copy of this order to each new member of A.I.R., to each new member of The Industrial Multiple, and to any person who inquires about, or who submits an application for, membership in A.I.R. or its MLS.

D. Within sixty (60) days after this order becomes final, submit a verified written report to the Federal Trade Commission setting forth in detail the manner and form in which respondents have complied and are complying with this order.

E. For a period of five (5) years after this order becomes final, maintain and make available to the Federal Trade Commission staff for inspection and copying, upon reasonable notice, all documents that relate to the manner and form in which respondents have complied with and are complying with this order.

F. Notify the Federal Trade Commission at least thirty (30) days prior to any proposed change in either respondent, such as dissolution, assignment, or sale resulting in the emergence of a successor corporation, the creation or dissolution of subsidiaries, or any other change in either corporation that may affect compliance obligations arising out of this order.

Commissioners Azcuenaga and Starek concurring in part and dissenting in part.

---

## SEPARATE STATEMENT OF COMMISSIONER MARY L. AZCUENAGA CONCURRING IN PART AND DISSENTING IN PART

The Commission today issues a consent order that would, among other things, bar the multiple listing service of Industrial Multiple from requiring real estate brokers to disclose to other brokers the amount of commission that a property seller will pay when the property is sold. Order paragraph I.C. In light of comments received during the period for public comment on the order and additional economic analysis based on those comments, I am persuaded that the conduct challenged in paragraph I.C. of the order may help accomplish a legitimate purpose of the multiple listing service, that is, the efficient marketing of real estate.

The commission arrangement to which the listing broker and the property owner have agreed is information that is important for selling brokers to have in deciding how much effort to invest toward selling the listed property. The Commission partially credits this justification in the proposed order (and in previous orders of the Commission involving multiple listing services) when it permits the multiple listing service to designate listings in which the property owner may avoid or reduce the commission by making a direct sale. To the extent that other brokers are not informed about the commission terms between the listing broker and the property owner, over time, efforts on the part of brokers other than listing brokers to sell properties may decrease and the sales of properties may be adversely affected.[1] Given this plausible efficiency rationale for the Industrial Multiple rule, and in the absence of demonstrable anticompetitive effects, I no longer can find reason to believe sufficient to challenge the rule under Section 5 of the Federal Trade Commission Act.

---

[1] To the extent that disclosure is consistent with the listing broker's interest in eliciting the cooperation of other brokers in marketing the property, the order ban on disclosure by the multiple listing service may simply raise the cost of disseminating and obtaining the information.